# 21-1929

## United States Court of Appeals
## for the Second Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

VULCAN SOCIETY, MARCUS HAYWOOD, CANDIDO NUNEZ,
ROGER GREGG, JAMEL NICHOLSON, RUSEBELL WILSON,
KEVIN WALKER, KEVIN SIMPKINS,

*Plaintiffs-Intervenors-Appellees,*

*against*

THE CITY OF NEW YORK,

*Defendant-Appellant,*

NEW YORK CITY FIRE DEPARTMENT, NEW YORK CITY
DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICES,
MAYOR MICHAEL P. BLOOMBERG, NEW YORK FIRE
COMMISSIONER NICHOLAS SCOPPETTA,

*Defendants.*

On Appeal from the United States District Court
for the Eastern District of New York

## BRIEF FOR APPELLANT

RICHARD DEARING
DEBORAH A. BRENNER
JAMISON DAVIES
  *of Counsel*

November 18, 2021

GEORGIA M. PESTANA
*Corporation Counsel*
*of the City of New York*
Attorney for Appellant
100 Church Street
New York, New York 10007
212-356-2490 or -0826
jdavies@law.nyc.gov

Reproduced on Recycled Paper

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .......................................................................iii

PRELIMINARY STATEMENT...................................................... 1

JURISDICTIONAL STATEMENT ................................................ 3

ISSUES PRESENTED FOR REVIEW ...................................... 3

STATEMENT OF THE CASE ..................................................... 4

    A.  The background of this action and the district court's
          remedial order, as modified by this Court on an earlier
          appeal ................................................................................ 4

    B.  The hiring process for entry-level firefighters, including
          the Candidate Physical Ability Test........................................ 8

    C.  The Monitor's recommendation that the district court
          find the City violated the Modified Remedial Order .............. 13

    D.  The district court's finding that the City violated the
          Modified Remedial Order ....................................................... 15

SUMMARY OF ARGUMENT  AND STANDARD OF REVIEW .......... 18

ARGUMENT ................................................................................ 20

POINT I ......................................................................................... 20

    THE DISPUTED PROVISION IS TOO AMBIGUOUS TO
    SUPPORT THE FINDING OF CONTEMPT ............................... 20

POINT II......................................................................................... 26

    THE CITY HAS MADE DILIGENT ATTEMPTS TO
    COMPLY WITH THE MODIFIED REMEDIAL ORDER............ 26

i

## TABLE OF CONTENTS (cont'd)

**Page**

CONCLUSION ......................................................................... 35

CERTIFICATE OF COMPLIANCE ....................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chao v. Gotham Registry, Inc.*,
514 F.3d 280 (2d Cir. 2008) ............................................................. 21

*Drywall Tapers & Pointers, Local 1974 v. Local 530 of
Operative Plasterers & Cement Masons International
Ass'n*,
889 F.2d 389 (2d Cir. 1989) ............................................................. 31

*Gucci Am. v. Bank of China*,
768 F.3d 122 (2d Cir. 2014) ............................................................. 21

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
512 U.S. 821 (1994) ......................................................................... 27

*Juan F. v. Weicker*,
37 F.3d 874 (2d Cir. 1994) ............................................................. 29

*King v. Allied Vision, Ltd.*,
65 F.3d 1051 (2d Cir. 1995) ..................................................... *passim*

*Missouri v. Jenkins*,
515 U.S. 70 (1995) ........................................................................... 28

*Next Invs., LLC v. Bank of China*,
12 F.4th 119 (2d Cir. 2021) ...................................................... 21, 24

*OSRecovery, Inc. v. One Groupe Int'l, Inc.*,
462 F.3d 87 (2d Cir. 2006) ............................................................. 18

*Paramedics Electromedicina Comercial, Ltda. v. GE Med.
Sys. Info. Techs., Inc.*,
369 F.3d 645 (2d Cir. 2004) ............................................................. 31

*Perez v. Danbury Hosp.*,
347 F.3d 419 (2d Cir. 2003) ............................................................. 33

iii

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Powell v. Ward,*
643 F.2d 924 (2d Cir. 1981) ........................................................ 30, 32

*United States v. City of New York,*
717 F.3d 72 (2d Cir. 2013) .................................................... 4, 5, 9, 10

*United States v. Yonkers Bd. of Educ.,*
946 F.2d 180 ................................................................................ 3

*Yurman Studio, Inc. v. Castaneda,*
2009 U.S. Dist. LEXIS 13870 (Feb. 23, 2009) ............................. 26, 27

**Statutes**

28 U.S.C. § 1291 ............................................................................ 3

28 U.S.C. § 1331 ............................................................................ 3

## PRELIMINARY STATEMENT

For over eight years, the City of New York has operated under a broad, complex modified remedial order entered to remedy deficiencies in the FDNY's hiring process that resulted in a disparate impact on minority candidates. In collaboration with the parties and a court-appointed Monitor, the City has worked diligently to implement the remedial order's terms, revamping the FDNY's hiring structure from top to bottom, supporting minority candidates throughout the process, and significantly improving diversity in the ranks.

After the most recent written exam, with the Monitor's approval, the City began to call candidates to take the Candidate Physical Ability Test (CPAT). The City informed the Monitor and the parties of the number of candidates to be called, with the goal of calling enough to fill two Academy classes at once. After two rounds, plaintiffs objected that the pace differed from previous hiring cycles, where they said only one class's worth of candidates had been called per round, and sought a finding that the City violated the order. Applying the test for contempt, the U.S. District Court for the Eastern District (Garaufis, U.S.D.J.) agreed and found the City in violation. This Court should reverse.

The district court made two errors. First, the court erroneously concluded that the remedial order clearly and unambiguously prohibited the City's decision. Nothing in the order's text provides that a change in the timing of calling candidates for the CPAT requires Monitor pre-approval. The court in effect read new details into the order, and then unfairly applied them retroactively to declare the City in contempt for its prior conduct. Second, the court erred in concluding that the City had not diligently complied with the remedial order, particularly in light of its own conclusion that the City has been generally compliant for years and that any breach had been made in good faith.

The City has no quarrel with the district court's forward-looking directives, which it immediately began to implement. Indeed, they are no more burdensome than many other requests by the Monitor and the parties that the City has readily satisfied. But the district court's finding of past misconduct by the City is both independently important and legally infirm: that unwarranted blemish on the City's long record of compliance should not stand, especially since plaintiffs have presaged their intent to leverage it to prolong the monitorship.

2

## JURISDICTIONAL STATEMENT

The district court has subject-matter jurisdiction under 28 U.S.C. § 1331. This Court has jurisdiction to review the district court's order under 28 U.S.C. § 1291. *See United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 183 (in cases involving "a protracted remedial phase," a "practical rather than a technical construction" of § 1291 applies, permitting review of substantive post-judgment orders) (cleaned up).[1]

## ISSUES PRESENTED FOR REVIEW

1. Did the district court err in concluding that the Modified Remedial Order unambiguously required the City to obtain advance approval to call candidates sufficient to fill two Academy classes at once, even assuming that represented a change from the City's prior practice?

2. In any case, where it is undisputed not only that the City obtained the Monitor's advance approval to administer the CPAT, but also scrupulously obtained approval for any number of parts of the complex hiring process beyond what the MRO requires, did the district

---

[1] This brief uses "(cleaned up)" to indicate that internal quotation marks, alterations, and citations have been omitted from quotations.

court erroneously extrapolate a failure to make reasonably diligent attempts to comply from what was, at most, a good-faith lapse in compliance?

## STATEMENT OF THE CASE

### A. The background of this action and the district court's remedial order, as modified by this Court on an earlier appeal

This Court is familiar with this remedial order from a previous appeal. *United States v. City of New York*, 717 F.3d 72, 76 (2d Cir. 2013). It is a structural injunction, designed to ameliorate disparate effects on Black and Hispanic applicants of written employment tests that were not validated as job-related, and to combat persistent racial disparities in the FDNY's ranks.

In a nutshell, the United States filed this suit against the City under Title VII in 2007, alleging that the City's procedures for hiring entry-level firefighters had a disparate impact on Black and Hispanic applicants (Joint Appendix ("A") 197–210). Shortly thereafter, the Vulcan Society—an organization of Black firefighters—and several individual plaintiffs intervened on behalf of a putative class of

4

firefighters and applicants alleged to have experienced discrimination (A216–38).

Both complaints centered on the FDNY's written examinations and its procedure for processing candidates in the order of their exam scores (A201–04; A217). The United States alleged that the exams were neither validated nor sufficiently job-related (A201–04). The Vulcan Society went further, alleging that the tests were used to discriminate against Black applicants intentionally (A217).

The district court found against the City on both claims at summary judgment and entered what this Court described as a "far-reaching permanent injunction." *City of New York*, 717 F.3d at 77. On appeal, this Court pared back the injunction after vacating the finding of intentional discrimination. *Id.* at 95–99. Still, due to "the distressing pattern of limited FDNY minority hiring," and especially since a similar 1973 determination had little effect, the Court left much of the injunction intact. *Id.* at 96, 98–99.

The operative modified remedial order (MRO), entered after remand, is far-reaching and complex (A240–66). It obligates the City to enact numerous reforms aimed at avoiding future potential disparate

5

impact to Black and Hispanic applicants and remedying lingering effects of the previous hiring system, such as devising a validated written exam that minimizes disparate impact, reforming the FDNY's EEO Office, overhauling character and fitness review, and developing strategies to reduce attrition of Black and Hispanic candidates during the entirety of the hiring process (A250–57). The MRO also appointed, at the City's expense, a Court Monitor to "oversee the City's compliance with the terms of this Order" (A243). The Monitor observes and reports on the City's compliance with its obligations, resolves disputes that may arise between the parties, and, in the case of noncompliance with the MRO, may recommend sanctions to be imposed by the district judge (A259–64).

The City has long recognized the desirability of—and the need for—a diverse firefighting force, and the current administration has consistently shown dedication to achieving that goal. For the past eight years, the parties and the Monitor have worked cooperatively to implement the MRO and ensure that the City's hiring procedures for entry-level firefighters are well tailored to alleviate the effects of past discrimination. Perhaps most relevant here, the City provides diverse

candidates with extensive support throughout the process to combat voluntary attrition, which has always been more pronounced among minority candidates (*see*, *e.g.*, A332–43).

The Monitor's supervision of the FDNY covers nearly every aspect of the application and hiring process for new firefighters, and the City has worked in good faith to address the parties' and the Monitor's concerns throughout the lifespan of the MRO. For example, the City revamped the challenged written examination and administered the most recent test with the Monitor's approval (E.D.N.Y. ECF No. 1761 at 44; E.D.N.Y. ECF No 1803 at 11). It made substantial enhancements to the character review process (E.D.N.Y. ECF No. 1844 at 38). And it implemented targeted outreach to limit attrition of diverse candidates between the written exam and eventual enrollment in the Fire Academy (*see* A333–40; 518–36). These measures include, among other things, employing current Black and Hispanic firefighters who serve as outreach coordinators, a mentorship program, and a Candidate Portal providing up-to-date information for each candidate about their status (A283–84, 472, 522–23).

7

Before this dispute arose, no party, including the Monitor, had ever claimed that the City failed to comply with any provision of the MRO.

## B. The hiring process for entry-level firefighters, including the Candidate Physical Ability Test

The process for becoming a New York City firefighter is rightly rigorous. Candidates must take a written exam, pass a physical ability test, pass a background check and a medical and psychological evaluation, and enroll in and graduate from the Fire Academy.

The current dispute involves only one piece of one discrete step in the full hiring process: the timing, for a limited group of candidates, of the Candidate Physical Ability Test (CPAT). After firefighter candidates take the written test, those who pass must take the CPAT, which is designed to assess whether they can meet the physical demands of being a firefighter.

Candidates are called to take the CPAT in descending order of their adjusted final scores on the written examination, plus any

applicable bonus points (A787).[2] To preserve fairness, all candidates who have the same adjusted final score, or fall within the same "band," must be permitted to take the CPAT simultaneously (*see id.*; E.D.N.Y. ECF No. 1844 at 44 (Monitor's report noting that all candidates with tied adjusted final scores "must be called off the list for processing at the same time")). Some bands include over a thousand candidates (A790).

The FDNY aims to fill two Fire Academy classes of 320 trainees per year (A716). To fill those classes, the FDNY must call about three times as many candidates to take the CPAT as there are available spaces in the Academy (A788). The 3:1 ratio reflects that not all candidates who are called will pass the CPAT, and some of those who pass will voluntarily drop out of consideration or be eliminated at a later stage (A716). Generally, the number of candidates called will be somewhat above the 3:1 ratio—or sometimes, due to the large size of the scoring bands, substantially above the enrollment goal (A787–89).

---

[2] Applicants may claim extra points for various reasons, such as New York City residency or veteran's status (A791).

In hiring from the civil-service list generated by Exam 7001, the most recent written exam, the City obtained approval to call its first round of candidates for the CPAT in October 2018 (A402; E.D.N.Y. ECF No. 1877 at 12). The City calculated how many bands of candidates to call by the number of candidates necessary to fill two Academy classes, approximately 640 seats, so it needed to call at least 1,920 candidates (A790). It reached candidates with an adjusted final score of 102, which amounted to approximately 2,400 candidates (*id.*). The Monitor's contemporaneous report indicates that the City did not just obtain advance permission to begin administering the CPAT; it also provided the Monitor and the parties with extensive information regarding candidate processing, including the CPAT, and explained that, due in part to the large size of the bands, the first round would include about 2,400 candidates (E.D.N.Y. ECF No. 1877 at 12).

After all the round-one candidates had been called, the City began the next round, which included candidates with adjusted final exam scores of 100 and 101, because a single band would likely not have been sufficient to fill the next two Academy classes (A790–91). And because these score bands were large, with over a thousand candidates in each,

the second round in total included approximately 3,000 candidates, as the City explained at a July 2019 status conference (A276), and as the Monitor noted in his periodic report (A329). The City also noted that the attrition rate from the prior round had been higher than usual, first because of the unusually large number of candidates in the band, and second because of individualized determinations—resulting from new investigatory initiatives designed to protect primarily Black and Hispanic city residents—that many candidates who claimed bonus points for City residency were not in fact eligible (A790–91).

The Monitor, in his next periodic status report, for the first time questioned whether this called for candidates to be invited off the list for CPAT testing in larger groups than had been the case for the previous exam (though it was no different from the first round from this exam) (A330). The City denied that any change had occurred, asserting that it had historically aimed to fill two Academy classes per round (A404). After the next status conference, the court ordered the Monitor to submit a report regarding the "acceleration of CPAT testing" (E.D.N.Y. Minute Entry dated Oct. 4, 2019).

11

After reviewing submissions by the parties, the Monitor issued a report concluding that the City "processed more candidates, at a faster pace, for [each round of] the CPAT for Exam 7001" than it had during the same process for the prior exam (A399). The Monitor found that the City had previously called only enough candidates to fill one Academy class at a time, twice per year, when hiring off the list generated by the prior exam and recommended further review of the City's decision and its effects, in particular on the attrition rate between the CPAT and enrollment in the Fire Academy for Black and Hispanic candidates (A405, 412–15).

Though the City denied making any change in the process, it was unable to counter the parties' statistical proof on the issue to the Monitor's satisfaction. According to Assistant Commissioner Marie Giraud, who had assumed her position at the CID in September 2019, the FDNY had also called two classes at once for previous civil-service lists, just as it had undisputedly done for the first round of this one—which may explain why the number of notifications sparked no comment from the Monitor or parties at the time (A790). But the City lacked competent evidence of historical FDNY hiring practices because

12

of a recent "complete change of Candidate Investigation Division …
management" (A810). Recognizing this complication, the Monitor
allowed for the possibility that the entire dispute had arisen from a
simple mistake, but concluded that such a mistake did "not preclude a
violation" (A727).

The City objected to the Monitor's conclusion, and the parties and
the Monitor wrote to address the City's objection (A416–45). In none of
those communications did the Monitor, or any party, suggest that the
City had violated the MRO (A436–45; 447–55). It was only at a later
status conference—two weeks after the City sought a pre-motion
conference in advance of moving for dissolution of the MRO—that the
parties requested a finding that the MRO had been violated (A478,
483).

## C. The Monitor's recommendation that the district court find the City violated the Modified Remedial Order

The United States and the Vulcan Society then formalized their
requests for a finding that the manner in which the City called
candidates for CPAT testing violated paragraph 16 of the MRO,
applying the standard for civil contempt based on the violation (A738,

13

762). That paragraph prohibits the City from taking "any step in any process for the selection of entry-level firefighters … without first obtaining the approval of the Court Monitor" (A246).

In turn, paragraph 11 defines the "[p]rocess for the selection of entry-level firefighters" as "any and all steps" taken by the City to hire entry-level firefighters (A244). It goes on to provide a non-exhaustive list of 16 examples of "steps" (A244–45). The only examples even arguably relevant here—and the only ones mentioned by the court—are: (1) assessing a candidate's physical fitness or ability, (2) determining if the candidate passed or failed any exam or assessment, (3) determining the candidate's character or fitness for the job, and (4) determining not to hire a candidate for any reason (Special Appendix ("SPA") 4). The other listed steps include, for example, administering the written exam, certifying a civil service hiring list, and investigating candidates' backgrounds (A244).

Notably, as a sanction for the alleged violation, the United States sought only a "clear finding" that the City violated the MRO and a requirement that the City document more thoroughly the steps in the hiring process to "eliminat[e] … confusion" (A767). Nonetheless, the

14

United States also declared that it would use the finding of a violation as a basis on which to oppose the City's forthcoming motion for dissolution of the MRO (*id.*).

The Monitor recommended that the district court find that the City violated paragraph 16 (A713–34). He found that the City's calling of enough candidates to fill two Academy classes constituted a "change" in the hiring process, that such a change was a "step" for which Monitor approval was needed, and that the decision therefore violated the MRO (A721–25). The Monitor proposed a number of actions to limit attrition of candidates who passed the CPAT and await further processing (A733–34).

### D. The district court's finding that the City violated the Modified Remedial Order

The district court adopted the Monitor's recommendation and found that the City violated paragraph 16 of the MRO (SPA3). The court first found that the MRO unambiguously required the City to obtain the Monitor's approval before changing the rate at which it called candidates to take the CPAT, accepted the Monitor's finding that

15

the City had made such a change, and found that its actions violated the MRO (SPA6–10).

The court reasoned that the decision to change the rate constituted a "step" in the hiring process because it was a "policy decision at the Department level" that carried "significant effects" on the timeline for candidate processing and, thus, on candidate attrition rates (SPA7). Ultimately, the court concluded that any "significant change to the hiring process" that is "undertaken without the approval of the Monitor" violates the MRO (SPA8).

Next, the court concluded that the City did not attempt to comply with the MRO in a reasonable manner merely because it never sought pre-approval from the Monitor for the particular "step" of determining how many classes to fill at once (SPA10). Yet, at the same time, the court recognized that the City had, over the course of the monitorship, been generally compliant with the MRO and consistently worked collaboratively with the plaintiffs and the Monitor (*id.*) Moreover, the court was persuaded that any breach had been made "in good faith" and that the City had made no attempt to conceal the rate at which candidates were called, finding instead that the City had provided all

16

evidence regarding which bands would be called, and when, to the Monitor in advance (*id*.).

Nevertheless, the court adopted all the Monitor's proposed remedial actions with the addition, requested by the United States, that they apply to Hispanic candidates in addition to Black candidates (SPA12–14). One of the court's remedies was the creation of a "summary document" outlining the "each step of the hiring process" whose purpose is make "clear under what circumstances the City is required to seek the Monitor's pre-approval" (SPA12–13). The City has already implemented, or begun to implement, the ordered remedial actions (*see* E.D.N.Y. ECF No. 2058 at 13–22). Indeed, the City had initiated similar measures of its own accord after consultation with the parties even before the dispute was adjudicated, while attempting to resolve it amicably, without the need for the court's involvement (*see* A915–19). The City's objection is that the predicate finding of a breach of the MRO, which impugns the City's record of compliance, cannot stand. This is particularly so in light of the United States' position that the finding will have a "preclusive effect … in relation to the City's plans to seek dissolution of the MRO" (A804).

17

## SUMMARY OF ARGUMENT
## AND STANDARD OF REVIEW

The district court evaluated the Monitor's recommendation under the legal standard for a finding of civil contempt (SPA5). This Court reviews a finding of contempt for abuse of discretion. *OSRecovery, Inc. v. One Groupe Int'l, Inc.*, 462 F.3d 87, 93 (2d Cir. 2006). But, because the power of the court to impose contempt liability is a potent weapon, this Court's "review of a contempt order for abuse of discretion is more rigorous than would be the case in other situations in which abuse-of-discretion review is conducted." *Id.* (cleaned up).

As the district court and parties recognized, the test for assessing the City's alleged lack of compliance is set forth in *King v. Allied Vision, Ltd.*, 65 F.3d 1051 (2d Cir. 1995). But the court misapplied the *King* standard, which bars a finding of contempt "where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct." *Id.* at 1058 (cleaned up). The court's error was twofold: it mistakenly held that the order "clearly and unambiguously" prohibits the City's conduct, and went on to wrongly conclude that the City has not diligently attempted to comply in a reasonable manner. *See id.*

18

First, the text of the MRO does not unambiguously forbid the City's actions here. There is no dispute that the City obtained the Monitor's approval before proceeding with the CPAT, after disclosing how many candidates would be called. The district court instead found that the City breached the MRO's clear terms because it did not obtain separate approval of the fact that the number was determined based on a decision to call enough candidates at one time to fill two Academy classes. Under the MRO, Monitor approval is needed before taking a "step" in the hiring process, and the MRO gives an extensive, exemplary list of the kinds of actions that constitute "steps" in the process (A244–45). The City's underlying basis for determining the number of candidates to be called to take the CPAT is not one of those steps, and nothing in the MRO unambiguously indicates otherwise.

No better founded is the district court's reasoning that the City's underlying thinking needed to be disclosed here because it was a "change" from prior practice with "significant effects" (SPA7). Nothing in the MRO's text spells out that those concepts determine whether something is a "step" in the hiring process requiring pre-approval by the Monitor. Even assuming that the court's gloss on the MRO were a

19

reasonable one, it would fall short of the kind of unambiguous notice required to support a finding of past non-compliance under *King*.

Second, it has never been disputed that the City has, throughout the lifetime of the MRO, diligently attempted to comply in a reasonable manner. Throughout the monitorship, the City has sought and received Monitor approval for even the smallest actions it took toward hiring entry-level firefighters. The district court effectively recognized as much. Still—disregarding the complexity of the MRO and the narrow violation—the court chose to focus myopically on the City's failure to obtain advance approval of this one disputed "step" to rule that there had been no reasonable attempt at compliance. This mistaken view led the court to improperly collapse the second and third elements of the *King* analysis into one.

## ARGUMENT

### POINT I

### THE DISPUTED PROVISION IS TOO AMBIGUOUS TO SUPPORT THE FINDING OF CONTEMPT

The first step of the *King* analysis is stringent. The order must leave "no uncertainty in the minds of those to whom it is addressed." *King*, 65 F.3d at 1058 (cleaned up). A party must "be able to ascertain

20

from the four corners of the order precisely what acts are forbidden." *Id.*; *accord Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 292 (2d Cir. 2008) (party must be able to determine "precisely what it can and cannot do"). And it must be sufficiently clear to the enjoined party "*at the time* of the alleged conduct" that the conduct would violate the order. *Next Invs., LLC v. Bank of China*, 12 F.4th 119, 131 (2d Cir. 2021). The "longstanding, salutary rule" provides that "ambiguities and omissions in orders redound to the benefit of the [party] charged with contempt." *Gucci Am. v. Bank of China*, 768 F.3d 122, 143 (2d Cir. 2014) (cleaned up).

Here, the MRO requires the City to obtain the Monitor's approval before "tak[ing] any step in any process for the selection of entry-level firefighters" (A246). And the district court's order begins with the observation that the "*CPAT* is an important step in the hiring process" (SPA6 (emphasis added)). But the record leaves no doubt: the City obtained permission to undertake the CPAT and also informed the Monitor of the number of candidates that would be called (A788; E.D.N.Y. ECF No. 1877 at 12). The only question is whether the MRO required the City to obtain a separate approval for its "change" of

procedure in calling up of enough candidates at one time to fill two Fire Academy classes. It did not.

The district court interpreted the MRO to require the City to seek additional permission, beyond the approval to begin the CPAT testing itself, because how many candidates to call at once "represented a policy decision at the Department level for how to best fill Academy classes as a whole" and because it had "significant effects" on hiring (SPA7). The court's analysis thus redefines the MRO to require approval of any sufficiently "significant change to the hiring process" (SPA8)—a gloss which has no home in the "four corners" of the MRO, and even if it did, would fail to give the City notice of "precisely what acts are forbidden." *King*, 65 F.3d at 1058 (cleaned up). Nowhere in the MRO's definition of the "[p]rocess for the selection of entry-level firefighters" (A244–45) is there any indication that City decision-making constitutes a "step." And even accepting the district court's interpretation of the MRO, there would remain the question of how "significant" the effects of a change must be to trigger paragraph 16.

The district court's vague standard also ignores the extensive definition of the hiring process set out in the MRO, which provides 16

examples of distinct "steps" (A244–45). One of the listed steps is "assessing an entry-level firefighter candidate's physical fitness or ability," *i.e.* administering the CPAT, but the definition makes no mention of the process for deciding how many candidates to call to take the CPAT or when to call them (*id.*). The district court also referred to three other "steps" in paragraph 11—determining whether a candidate has passed or failed any examination, determining not to hire a candidate, and determining whether a candidate lacks the character and fitness to be hired—but none of those have anything to do with how many candidates to call for the CPAT (SPA6). And while the definition provides that those 16 examples are "without limitation" (A244), they illustrate the types of decisions and processes that should be counted as steps in the hiring process, and none are analogous to the much more granular decision challenged here (A244–45). Instead, the omission of anything like the City's decision here, or of any reference to a "change" in policy or procedure, from the definition's thorough listing of steps in the hiring process at least clouds the question of whether the City's challenged decision is in itself a "step" in the process.

23

In short, reversal is warranted because there is no basis for the court to conclude that the City could know with "no uncertainty" based solely on the "four corners of the order" that pre-approval was required as to the City's underlying thinking for determining how many candidates should be called as part of CPAT administration. *King*, 65 F.3d at 1058. While the broad language of the MRO likely allowed the district court or the Monitor to prospectively order advance approval of "policy decision[s]" with "significant effects," the court's retroactive finding that the City violated its existing order, with the attendant implication of censure by the court and potential preclusive effects in future litigation, cannot be justified. *See Next Investments,* 12 F.4th at 131 (holding that it must be clear "at the time of the alleged conduct" that it was a violation).

Though the wording of the MRO speaks for itself, it is also instructive that neither the court nor the Monitor initially suggested that the City violated paragraph 16 of the MRO, even once they were undisputedly aware of number of candidates that had been called for each round (A276–77; 397–415). Likewise, neither the United States nor the Vulcan Society contended that paragraph 16 had been violated

24

in their responsive filings submitted after the Monitor issued a detailed report on CPAT testing (A436–45; 447–55). If it were plain from the MRO's text that advance Monitor approval of this part of the process was required, presumably the court, the Monitor, or a party would have suggested as much as soon as these facts came to light, or, at the very least, after the Monitor had issued a lengthy report on the precise subject, rather than waiting until the City announced its intent to move for dissolution of the MRO.

In the same vein, beyond the simple finding that the City violated the MRO, the sole remedy sought by the United States, which the district court ordered, was the creation of a document enumerating "each step of the hiring process" to make "clear under what circumstances the City is required to seek the Monitor's pre-approval and to avoid another dispute" (SPA12–13; *see also* A767 (United States requesting the same document to "eliminat[e] any confusion … between the City, other Parties, and [the] Monitor" about the steps in the process)). Again, the City does not dispute the court's authority to order the creation of that document, or to use it as a potential basis on which to decide what approvals are needed prospectively. But, on its face, the

remedy also indicates that what conduct would violate the MRO was *not* clear at the time of the City's decision and highlights the court's error under the first *King* prong, particularly in light of its significant potential collateral effects.

## POINT II

### THE CITY HAS MADE DILIGENT ATTEMPTS TO COMPLY WITH THE MODIFIED REMEDIAL ORDER

Even assuming the MRO clearly prohibited the City's decision about when and how to call candidates to take the CPAT, the district court nonetheless erred in concluding that the City had not "diligently attempted to comply in a reasonable manner" with the MRO. *King*, 65 F.3d at 1058.

While this Court "has not been squarely confronted with the question of what constitutes 'reasonable diligence,' it has noted that 'substantial compliance' is the appropriate standard in evaluating noncompliance in a contempt case." *Yurman Studio, Inc. v. Castaneda*, 2009 U.S. Dist. LEXIS 13870, at \*7 (Feb. 23, 2009) (citing *Juan F. v. Weicker*, 37 F.3d 874, 879 (2d Cir. 1994)). Here, as no party disputed, and as the district court itself found, the City has substantially

26

complied with the MRO over its eight-year lifespan (SPA10). And, in the context of this narrower disagreement, there is no dispute that the City had approval to begin the CPAT and provided data about how many candidates would be called per round (*id.*). Even assuming the City misinterpreted the order here, or made a good-faith mistake of fact about whether it was continuing or changing its prior practice, that must be weighed against the City's compliance with the order as a whole and its reasonable diligence in obtaining approval to administer the CPAT.

That much is plain from step three of the *King* test, which asks whether the party against whom contempt is sought has "diligently attempted to comply in a reasonable manner" with "the order." *King*, 65 F.3d at 1058. While, as noted, the precise meaning of the third step has not been extensively analyzed by thus Court—particularly in the comparatively rare circumstance of an ongoing, structural injunction covering a wide swath of conduct—the test should consider the enjoined party's overall course of conduct with respect to "the order" at issue because such injunctions are inherently more ambiguous and difficult to comply with. *Cf. Int'l Union, United Mine Workers of Am. v. Bagwell*,

512 U.S. 821, 844 (1994) (Scalia, J., concurring) ("When an order governs many aspects of a litigant's activities, rather than just a discrete act, determining compliance becomes much more difficult."); *Missouri v. Jenkins*, 515 U.S. 70, 134–35 (1995) (Thomas, J., concurring) (extensive post-relief proceedings to achieve a "broad, abstract, and often elusive goal …. deprive the parties of finality and a clear understanding of their responsibilities").

Here, there is no dispute that the City has been substantially compliant with the MRO. Indeed, the Vulcan Society noted that the City has "routinely sought Monitor approval" for a variety of changes, down to such minutiae as "language changes in communications to candidates" (A746), which plainly do not rise to the level of a "step" under the MRO. The district court similarly noted that there has been "over the years … a very good effort by the parties to communicate with each other in advance" of all the City's hiring actions (A490). The City provides information and schedules meetings to be held before every step of the hiring process, which allows the Monitor and the parties to ask questions and raise any objections, which the City works to promptly address (A910). Indeed, the district court found that the City

28

had been "generally compliant" with the MRO and that any breach had been made "in good faith" (SPA10). The finding of general compliance should be conclusive—it closely tracks this Court's "substantial compliance" standard. *See Juan F.*, 37 F.3d at 879.

The Vulcan Society erroneously implied that the City's excellent record of seeking Monitor approval even where not explicitly required by the MRO's text suggests that this decision, too, clearly required advance approval (A746). But the fact that a party may have previously gone above and beyond the strict text of the order does not change the *King* analysis, which specifically bars such extrinsic attempts to clarify an ambiguity in the four corners of the order. Rather, the City's long record of compliance is strong evidence that step three of the *King* test should be resolved in its favor.

Likewise, even assuming the "reasonable diligence" test is narrowed to the more specific context of the City's approach to administering the CPAT, the district court's finding still cannot stand. The City obtained permission to begin the CPAT and operated under the belief that its decision about how many candidates to call at once was a continuation of its prior practice, for which there was no need to

29

obtain specific approval (A790). The fact that the alleged breach was made in good faith, and that the relevant data was never concealed from the Monitor or the parties, demonstrates that the City made a diligent attempt to comply with this specific provision of the MRO in this instance too. Thus, even assuming the current decision was a violation of a clear provision of the MRO, the City has diligently attempted to "accomplish what was ordered," *Powell v. Ward*, 643 F.2d 924, 931 (2d Cir. 1981), whether that is assessed by the broad context of the MRO's objective to eliminate lingering disparate impacts on minority firefighters and applicants, or in meeting (or surpassing) paragraph 16's mandate to seek advance approval of all steps in the hiring process, or in initiating the CPAT for Exam 7001.

In holding to the contrary, the district court reasoned that the City did not make "any attempt to comply with the unambiguous command of the MRO because it never sought any form of pre-approval from the Monitor" before changing its CPAT-administration practice from one class at a time to two (SPA10). This reads the third step of *King* too narrowly. In the context of a broad structural injunction, rather than a focused, specific order, the analysis should consider the

30

party's overall diligence in attempting to comply. Where an order imposes a set of wide-ranging obligations on a party, it is critical to evaluate the third step in the context of the party's compliance with the order as a whole, over time, on a good-faith basis.

At most, as the district court acknowledged, the City may have had "mistaken beliefs" about whether the MRO was ambiguous or whether the City's conduct complied with it (SPA10). But a mistaken belief is relevant to assessing a party's reasonable diligence. If a party reasonably and in good faith believes that it has done what it must to comply with the order, that at least strongly supports the conclusion it has been diligent, especially where the party has an otherwise unbroken record of compliance. By contrast, where this Court has held that parties have not made reasonable attempts to comply with a court order, the parties' violations were clear-cut and egregious, rather than good-faith misconstructions of the order or a mistaken belief about what was necessary for compliance.[3]

---

[3] *See*, *e.g.*, *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 656 (2d Cir. 2004) (defendant failed to dismiss foreign litigation as ordered and its explanation for its failure was "specious"); *Drywall Tapers & Pointers, Local 1974 v. Local 530 of Operative Plasterers & Cement*

*(cont'd on next page)*

31

The district court's interpretation effectively collapses the second and third steps of the *King* inquiry into one. The court discounted the City's general compliance and good faith, explaining that they "do not speak[] to the issue at hand" because the "City did not comply with the MRO" (SPA10). But the question of whether the plaintiffs showed by clear and convincing evidence that the City "did not comply with the MRO" is step two of the *King* inquiry, not step three. *See King*, 65 F.3d at 1058. The district court, in effect, reasoned at step three that the City could not show that it made a reasonably diligent attempt to comply with the MRO because it failed at step two. That misapplies the law by erroneously reading the third step out of the *King* analysis.

The district court further relied on the premise that willfulness is not necessary for a finding of contempt (SPA10 (citing *EEOC v. Local 638 … Local 28 of Sheet Metal Workers' Int'l Ass'n*, 753 F.2d 1172, 1178

---

*Masons International Ass'n*, 889 F.2d 389, 396 (2d Cir. 1989) (defendants "unequivocally and consciously" violated order); *EEOC v. Local 638 … Local 28 of Sheet Metal Workers' Int'l Ass'n.*, 753 F.2d 1172, 1183 (2d Cir. 1985) (party engaged in "foot-dragging egregious noncompliance" with multiple provisions of the order even after the plaintiffs and court-appointed administrator urged compliance); *Powell*, 643 F.2d at 930 (official had been in office for nine months before she learned of the existence of the order and "lacked sufficient concern for the actual state of compliance efforts once she did learn" of the order).

32

(2d Cir. 1985))). But willful noncompliance is a separate question from whether the party made a reasonably diligent effort to comply with the order. Indeed, a party that willfully disobeyed an order would be hard-pressed ever to argue that it simultaneously displayed reasonably diligent compliance. By contrast, it is relevant to the inquiry at step three whether defendants took "any direct steps to contravene the" order. *Perez v. Danbury Hosp.*, 347 F.3d 419, 425 (2d Cir. 2003). The district court's conclusion that the City's conduct was not willful, in conjunction with its conclusion that the City has been generally compliant and that any breach was in good faith and not concealed, compels a finding for the City at step three, even assuming the MRO is sufficiently clear and unambiguous.

*       *       *

The district court's finding of non-compliance by the City cannot stand. The Court first erred in concluding that the MRO unambiguously required the City to seek advance approval of its decision to call candidates for two Academy classes at once. The MRO's language contains no such clear requirement. This is confirmed by the district court's reliance on the decision's effects, or its status as a "policy"

33

determination, as neither of those concepts is written into the MRO. And, by unduly limiting its consideration of reasonable diligence, the district court compounded its error in finding the City had not reasonably attempted to comply. For either reason, this Court should reverse.

## CONCLUSION

The district court's order should be reversed.


Dated:   New York, NY
          November 18, 2021

                              Respectfully submitted,

                              GEORGIA M. PESTANA
                              *Corporation Counsel*
                              *of the City of New York*
                              Attorney for Appellant


                       By:   /s/ Jamison Davies
                              JAMISON DAVIES
                              Assistant Corporation Counsel

                              100 Church Street
                              New York, NY 10007
                              212-356-2490
                              jdavies@law.nyc.gov

RICHARD DEARING
DEBORAH A. BRENNER
JAMISON DAVIES
    *of Counsel*

35

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 6,651 words, not including the table of contents, table of authorities, this certificate, and the cover.

<u>         /s/ Jamison Davies         </u>
JAMISON DAVIES