# No. 21-1929

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

CITY OF NEW YORK,

Defendant-Appellant

*(see inside cover for continuation of caption)*
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

_____

BRIEF FOR THE UNITED STATES AS APPELLEE

_____

KRISTEN CLARKE
 Assistant Attorney General

BONNIE I. ROBIN-VERGEER
BARBARA SCHWABAUER
 Attorneys
 U.S. Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, D.C.  20044-4403
 (202) 305-3034

*(continuation of caption)*

_____

VULCAN SOCIETY, MARCUS HAYWOOD, CANDIDO NUNEZ,
ROGER GREGG, JAMEL NICHOLSON, RUSEBELL WILSON,
KEVIN WALKER, KEVIN SIMPKINS,

Plaintiffs-Intervenors-Appellees

v.

NEW YORK CITY FIRE DEPARTMENT, NEW YORK CITY DEPARTMENT OF
CITYWIDE ADMINISTRATIVE SERVICES, MAYOR MICHAEL P.
BLOOMBERG, NEW YORK FIRE COMMISSIONER NICHOLAS SCOPPETTA

Defendants

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ................................................................. 1

JURISDICTIONAL STATEMENT ............................................. 2

STATEMENT OF THE ISSUE ................................................ 4

STATEMENT OF THE CASE ................................................. 4

    1.    *The Litigation Leading To The Modified Remedial Order* ................. 4

    2.    *The Modified Remedial Order* ............................................. 7

    3.    *The CPAT Stage Of The City's Selection Process*
        *For Entry-Level Firefighters* ............................................. 9

    4.    *The City's Change To The Initiation Of The CPAT Stage*
        *For Exam 7001 Without Monitor Approval* ......................... 12

        a.    *The First Two Rounds Of The CPAT Stage*
              *For Exam 7001* ................................................ 12

        b.    *Discovery Of The City's Change To The CPAT Stage* ............. 15

    5.    *Proceedings Before The Monitor And The District Court* ................. 17

        a.    *The Monitor's Recommendation* ............................... 18

        b.    *The District Court's Order* ....................................... 20

SUMMARY OF ARGUMENT ................................................ 22

ARGUMENT

    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
    BY FINDING THAT THE CITY VIOLATED PARAGRAPH 16
    OF THE MODIFIED REMEDIAL ORDER ............................... 24

**TABLE OF CONTENTS (continued):**                                    **PAGE**

A.  *Standard Of Review* ...............................................24

B.  *The District Court Correctly Found That The City
    Violated Paragraph 16 Of The MRO Based On The
    Three-Factor Test In* King.......................................25

    1.  *Under The First* King *Factor, The District Court
        Correctly Found That Paragraph 16 Of The MRO
        Was "Clear And Unambiguous"*...................................26

        a.  *Paragraph 11 And Additional Provisions
            Of The MRO Make Clear The City's
            Obligations Under Paragraph 16* .......................27

            i.   *Paragraph 11 Clearly Indicates That
                 The "Steps" Governed By The MRO
                 Include Policy Decisions
                 Initiating The CPAT Stage
                 Of The Hiring Process* .............................27

            ii.  *MRO Provisions Regarding The
                 Monitor's Duties Also Show
                 That Policy Decisions In The
                 Hiring Process Affecting Attrition
                 Are Subject To Monitor Approval*.............30

        b.  *The City's Arguments To The
            Contrary Are Not Persuasive* ...............................31

    2.  *Under The Second* King *Factor, The District
        Court Correctly Found Proof Of The City's
        Noncompliance With Paragraph 16*...............................36

    3.  *Under The Third* King *Factor, The District
        Court Correctly Found That The City Did
        Not Diligently Attempt To Comply With
        Paragraph 16 In A Reasonable Manner* .......................36

**TABLE OF CONTENTS (continued):**                    **PAGE**

*a.*    *The District Court Did Not Err By*
        *Focusing On The City's Specific*
        *Conduct In This Dispute Rather*
        *Than On Its Overall Compliance*
        *With The MRO* ......................................................38

*b.*    *The District Court Did Not Err By*
        *Finding The City Failed To Diligently*
        *Comply With The MRO Even Though The*
        *City's Failure To Comply May Have*
        *Been Inadvertent* ..................................................40

CONCLUSION .................................................. 41

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:** **PAGE**

*EEOC* v. *Local 638*, 753 F.2d 1172 (2d Cir. 1985),
   aff'd, 478 U.S. 421 (1986) ...........................................................................40

*International Bus. Machs. Corp.* v. *United States*, 493 F.2d 112
   (2d Cir. 1973) ...........................................................................................3

*International Union, United Mine Workers of Am.* v. *Bagwell*,
   512 U.S. 821 (1994) ..................................................................................39

*Juan F.* v. *Weicker*, 37 F.3d 874 (2d Cir. 1994),
   cert. denied, 515 U.S. 1142 (1995) ........................................................ 38-39

*King* v. *Allied Vision, Ltd.*, 65 F.3d 1051 (2d Cir. 1995) ............................... *passim*

*Missouri* v. *Jenkins*, 515 U.S. 70 (1995) ..................................................39

*Next Invs., LLC* v. *Bank of China*, 12 F.4th 119 (2d Cir. 2021) .........................25

*Paramedics Electromedicina Comercial, Ltda.* v. *GE Med. Sys. Info.*
   *Techs., Inc.*, 369 F.3d 645 (2d Cir. 2004) ....................................................40

*Perez* v. *Danbury Hosp.*, 347 F.3d 419 (2d Cir. 2003) ................................. 40-41

*United States* v. *City of N.Y.*, 717 F.3d 72 (2d Cir. 2013) ............................. *passim*

*United States* v. *Local 1804-1, Int'l Longshoremen's Ass'n*,
   44 F.3d 1091 (2d Cir. 1995) ......................................................................25

*Yurman Studio, Inc.* v. *Castaneda*, No. 1:07cv1241,
   2009 U.S. Dist. LEXIS 13870 (S.D.N.Y. Feb. 23, 2009) .......................38

**STATUTES:**

28 U.S.C. 1291 ..........................................................................................3

28 U.S.C. 1331 ..........................................................................................3

**STATUTES (continued):**                                                      **PAGE**

42 U.S.C. 2000e *et seq.*.................................................................................3

**MISCELLANEOUS:**

15B Charles Alan Wright, *et al.*, Fed. Prac. & Proc. § 3917 (2d ed. 2021) .............3

*Determine*, Webster's Dictionary (online ed. 2021),
       https://www.merriam-webster.com/dictionary/determine ........................29

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

No. 21-1929

UNITED STATES OF AMERICA, *et al.*,

Plaintiffs-Appellees

v.

CITY OF NEW YORK, *et al.*,

Defendants-Appellants

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

_____

BRIEF FOR THE UNITED STATES AS APPELLEE

_____

## INTRODUCTION

Although this litigation is longstanding and the relief ordered in this case is complex, the only dispute before this Court—if it concludes that it has jurisdiction to hear this appeal—is a narrow one. The issue this Court must decide is whether the City of New York (City) violated a provision of the modified remedial order (MRO), issued in 2013, that requires the City to first seek approval from the court-appointed Monitor before changing any step in its

hiring process for entry-level firefighters. The MRO also charges the Monitor with ensuring that the City minimizes candidate attrition and does not otherwise perpetuate the underrepresentation of Black and Hispanic firefighters caused by its past discrimination. Here, the City more than doubled the number of candidates called to take the Candidate Physical Abilities Test (CPAT) at a single time without seeking Monitor approval. This policy decision had a significant effect—substantially increasing candidate wait times at crucial points in the City's already lengthy hiring process, and therefore increasing the risk of additional attrition by Black and Hispanic candidates.

The district court ruled that the City violated the MRO by changing how the City initiates the CPAT stage without first obtaining Monitor approval. The court also ordered the City to undertake certain measures to remedy this violation. The City does not oppose these measures and has already begun to implement them, but it nonetheless challenges the court's determination that the City violated the MRO in the first place. This Court has no jurisdiction to entertain that challenge, but if the Court disagrees and reaches the merits, then it should affirm the district court's determination, which was correct.

## JURISDICTIONAL STATEMENT

This appeal involves the City's challenge to an order arising out of its failure to comply with the governing MRO in this case, which the United States

- 3 -

brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq*. The district court has subject matter jurisdiction pursuant to 28 U.S.C. 1331.

This Court lacks appellate jurisdiction to hear the City's challenge. As an initial matter, the district court did not find the City in contempt of the MRO. The Monitor likewise did not recommend that the district court find the City in contempt, although he agreed to apply this Court's test for civil contempt, set forth in *King* v. *Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995), to this dispute for purposes of determining whether the City violated the MRO. A719; see also A768. With that backdrop, it becomes clear that in largely adopting the Monitor's recommendation, the district court did not find the City in contempt, but simply "follow[ed] the same analysis" as the Monitor in finding that the City breached the MRO. SPA5. But whether or not the district court's order is labeled as a contempt order, the City has not cited any precedent holding that a district order finding that a party violated an ongoing remedial order, and imposing remedies that the party does not contest, is appealable as a final order under 28 U.S.C. 1291. See generally, 15B Charles Alan Wright, *et al.*, Fed. Prac. & Proc. § 3917 (2d ed. 2021); *International Bus. Machs. Corp.* v. *United States*, 493 F.2d 112, 114-115 (2d Cir. 1973); see also Plaintiffs-Intervenors' Br.

- 4 -

## STATEMENT OF THE ISSUE

As relevant here, paragraph 16 of the MRO provides that the City of New York "shall not take any step in any process for the selection of entry-level firefighters, or use any examination as part of such process, without first obtaining the approval of the Court Monitor." We address the following issue:

Whether the district court abused its discretion in finding that the City violated paragraph 16 when the City failed to obtain the Monitor's approval for changing how it initiated the CPAT for Exam 7001.

## STATEMENT OF THE CASE

*1. The Litigation Leading To The Modified Remedial Order*

The United States brought a Title VII suit in 2007 against the City for discrimination in its hiring process for the Fire Department of the City of New York (FDNY). A197-A214.[1] In particular, the United States alleged that the City's use of two written examinations, administered in 1999 and 2002, had an unlawful disparate impact on Black and Hispanic applicants for entry-level firefighter positions. A198-A207. Shortly thereafter, the Vulcan Society (an association of Black firefighters) along with several Black firefighter applicants

---

[1] "A____" refers to the relevant page in the joint appendix, and "SPA___" refers to the relevant page in the City's special appendix. "Doc. ___" refers to the document's district court docket number. "Br. ___" refers to pages in the City's opening brief.

intervened in the suit, joining the United States' disparate impact claims as well as bringing additional claims against the City.  A216-A238.

In 2009, the district court granted the United States' and plaintiffs-intervenors' motion for summary judgment on the disparate impact claims. *United States* v. *City of N.Y.*, 717 F.3d 72, 79 (2d Cir. 2013) (*FDNY*) (recounting litigation history); see also Doc. 294 (summary judgment order). In particular, the court ruled that the challenged written exams, which the City used between 1999 and 2007, disproportionately screened out Black and Hispanic applicants for entry-level firefighter positions and were not job-related and consistent with business necessity.  *FDNY*, 717 F.3d at 78-79; see also Doc. 294.  As the remedial phase of this litigation developed, the United States and plaintiffs-intervenors also objected to the City's proposal to hire candidates using a subsequent written examination, administered in 2007. *FDNY*, 717 F.3d at 79; see also Doc. 505 (order regarding 2007 exam).  The district court found that this examination also failed to meet the requirements of Title VII's disparate impact provision and enjoined the City's use of the exam. *FDNY*, 717 F.3d at 79-80; see also Doc. 505.

After issuing these rulings, the district court held a bench trial in 2011 to assess the scope of the injunctive relief necessary and appropriate to remedy the City's Title VII violations.  *FDNY*, 717 F.3d at 80; see also Doc. 741

(findings of fact).  As relevant here, the district court found that the City's
unlawful discrimination was likely to have continued effects on the hiring
process by exacerbating the attrition of Black and Hispanic candidates who
successfully complete the written examination.  Doc. 741, at 4-8, 14-15.  The
court observed that a significant number of candidates "drop out" of the hiring
process after passing the written examination.  Doc. 741, at 4-8, 14.  The court
found that this candidate attrition occurs in significant part because the multi-
stage hiring process for entry-level firefighters—from a candidate first taking
the entry-level screening examination to receiving an offer to attend the FDNY
academy—can take several years to complete.  Doc. 741, at 4-7.

As the district court also found, a significant factor in preventing attrition
is whether the candidate has a friend or family member who is a current or
former FDNY firefighter who can informally mentor them through the lengthy
process.  Doc. 741, at 8-12.  Because of the "City's history of using
discriminatory testing procedures that systematically excluded" Black and
Hispanic applicants from becoming firefighters, Black and Hispanic applicants
are "significantly less likely" to have a friend or a family member who can
provide this informal mentorship after passing the written examination.  Doc.
741, at 14-15.  As a result, the court found that injunctive relief was necessary
to ensure that attrition in the hiring process did not further "perpetuate the

underrepresentation" of Black and Hispanic firefighters in the FDNY caused by the City's Title VII violations. Doc. 741, at 15; see also Br. 6-7. Consistent with these findings, the district court issued a remedial order in 2011 to eliminate the effects of the City's discriminatory examinations and to prevent similar discrimination in the future. Doc. 765.

The City appealed this initial remedial order (and other rulings not at issue here). *FDNY*, 717 F.3d at 80-81. On appeal, this Court observed that despite the substantial Black and Hispanic population in the City, "[t]he low percentage of [Black and Hispanic] firefighters has persisted for some time," dating back to at least the 1960s. *Id.* at 77-78. Although this Court required modification of certain remedial provisions, it affirmed the vast majority of the order's original relief, including, as relevant here, "appointing a Monitor to oversee the FDNY's long-awaited progress toward ending discrimination" and "ordering steps to lessen minority attrition" during the City's lengthy hiring process. *Id.* at 97. In doing so, this Court recognized that "considerably more relief" than a typical disparate impact case was "warranted in this case in light of the distressing pattern of limited FDNY minority hiring." *Id.* at 95-96.

## 2.   *The Modified Remedial Order*

On remand, the district court issued the MRO, which governs the current dispute. A240-A266. Among other provisions, the MRO appoints a Monitor to

- 8 -

oversee the City's compliance with requirements to develop an "attrition mitigation plan" and "conduct a comprehensive top-to-bottom assessment of all steps" in its hiring process, as well as the City's compliance with its obligation to "eliminate all policies and procedures that are not job related or required by business necessity and either have a disparate impact on [B]lack and Hispanic firefighter candidates or perpetuate the effects of said disparate impact." A247, A250-A252, A259-A260.

As relevant here, paragraph 16 of the MRO requires the City to first seek approval of the Monitor before undertaking "any step in any process for the selection of entry-level firefighters, or us[ing] any examination as part of such process." A246. As used in the MRO, the term "[p]rocess for the selection of entry-level firefighters" refers to "any and all steps taken by the City to hire entry-level firefighters." A244 (paragraph 11). The MRO provides a non-exhaustive list of these steps, including (among others):

- "assessing an entry-level firefighter candidate's physical fitness or ability;"

- "determining that an entry-level firefighter candidate has passed or failed any examination or assessment at any stage of his or her candidacy;"

- "determining to begin investigating any entry-level firefighter candidate's background or eligibility to be hired as an entry-level firefighter;"

- "determining that an entry-level a [sic] firefighter candidate possesses or does not possess the character or fitness to be a an [sic] entry-level firefighter"; and

- "determining not to hire" an entry-level firefighter candidate "for any reason," including that the entry-level firefighter candidate "does not possess the character or fitness necessary to be a an [sic] entry-level firefighter."

A244-A245.  Paragraph 52 of the MRO provides the district court with the authority to impose sanctions for a violation of the MRO's terms "if another party or the Court Monitor moves for such sanction."  A259.

The first hiring process for entry-level firefighters governed by the MRO was for Exam 2000, which was administered in 2012 and used to select candidates for the FDNY academy between 2013 and 2017.  See A243, A248-A250, A389-A390.  The current hiring process subject to the MRO is for Exam 7001, which was administered in 2017 and has been used to hire entry-level firefighter candidates since October 2018.  A716.

3.     *The CPAT Stage Of The City's Selection Process For Entry-Level Firefighters*

The City's selection process involves several major examinations (or assessments) used to screen individual candidates as entry-level firefighters: the written (or computerized) examination, the physical abilities test (the CPAT), a background check, and a medical and physical evaluation.  See A244-A245; Br. 8.  The CPAT is the "first stage of the hiring process" after an

eligible list is certified from the combined results of the computerized

examination and other credits.  SPA3; A714.  It is where the City assesses an

entry-level firefighter candidate's physical fitness or ability.  SPA3; A714.  It is

also "a point at which many candidates drop out of the process (either

voluntarily or involuntarily)."  A714.

The City begins the CPAT stage by calling candidates, in descending

order from the eligible list, based on their total scores.  SPA3; A716.

Candidates who have the same total score are treated as a single score band,

and the City calls all candidates with the same total score to take the CPAT at

the same time.  A716.

The City determines how many candidates to call for the CPAT, and

therefore which score bands it will reach, based on the number of spots it seeks

to fill at the academy.  SPA4; A716.  There are approximately 320 spots in each

academy class, and the City typically seeks to fill two academy classes each

year, one in summer and the other in winter.  SPA4; A716.[2]  Because not all

candidates will pass the CPAT (or subsequent screening devices), and because

some may drop out of the hiring process, the City must call more candidates to

---

[2]  The Covid-19 pandemic prevented the City from holding academy classes
at the frequency and size it originally anticipated.  See, *e.g.*, Doc. 2029, at 2-3, 10.
The resulting adjustments are not relevant to the City's paragraph 16 violation.

take the CPAT than the number of available academy spots. SPA4; A716. To account for this, the City calls three candidates for every academy slot. SPA4; A716 & n.3. Thus, to fill a typical single academy class, the City would seek to call approximately 960 candidates. SPA4; A716 & n.3. However, the actual number of candidates called may be even higher because the City calls all candidates in a single score band at the same time. A716. The City typically hires eight academy classes during the four-year life of an eligible list (two classes per year) (A404, A716), which means that the City expects to reach roughly 7680 candidates on the eligible list to fill these classes (depending on the size of the score band).

The CPAT stage is the "greatest source of voluntary candidate attrition"—candidates dropping out—in the City's hiring process. A400-A401, A714. For this reason, the CPAT "has long been the focus of attention by the Court, the Monitor, and the Parties" in light of the City's prior unlawful discrimination. A714; see also, *e.g.*, A275-A294 (status conference involving discussion of numerous aspects of the CPAT).

During and after the Exam 2000 hiring process, the City worked closely with the Monitor and the other parties to review the CPAT stage in light of persistent attrition concerns. See A401. That effort led to the City adopting several measures to mitigate attrition connected to the CPAT, including a

mentorship program, text and email encouragement, and calls to encourage candidates to reschedule missed appointments. A401. In reviewing candidate attrition from Exam 2000, the Monitor found that "communication and preparation are likely to improve CPAT outcomes, especially for those candidates who have neither prior experience with the FDNY hiring process nor the benefit of friends and/or family who can share their own experience and guidance." A714.

4.    *The City's Change To The Initiation Of The CPAT Stage For Exam 7001 Without Monitor Approval*

    a.    *The First Two Rounds Of The CPAT Stage For Exam 7001*

In October 2018, with the plan of holding its first academy class for Exam 7001 candidates in Summer 2019, the City began to call candidates from the Exam 7001 eligible list to take the CPAT. SPA4; A716; Doc. 1877, at 12-13. During this first round of CPAT processing, the City decided to call at least 1920 candidates—enough candidates to fill *two* academy classes—to take the CPAT in December 2018. SPA4. This was a change from the City's practice for Exam 2000 (when the City called enough candidates to fill just one academy class at a time). SPA4.[3] Although the City informed the Monitor of

---

[3] Because the City calls all candidates in a particular score band simultaneously, the City in fact called even more than 1920 candidates—it

(continued...)

- 13 -

its plans to start this CPAT stage, the City never disclosed, and thus never

sought approval for, its decision to call enough candidates to fill two academy

classes at once.  See SPA10; A726; see also Doc. 1877, at 12-13.

After this first round of CPAT testing for Exam 7001, the Monitor found,

based on the City's data, that attrition rates for Black and Hispanic candidates

called for the CPAT were higher than those for White candidates.  Doc. 1896, at

10-12.  Given this new finding, coupled with findings from Exam 2000 about

likely increases in attrition over the life of an eligible list, the Monitor

emphasized in early 2019 the importance of the City's efforts to continue to

minimize attrition to ensure the pool of Black and Hispanic applicants did not

further diminish during Exam 7001 hiring.  Doc. 1896, at 12.

In May 2019, with its second academy class starting in November 2019,

the City called an additional cohort of Exam 7001 candidates to take the CPAT

in September 2019.  A329.  This cohort again consisted of enough candidates to

fill at least two Academy classes.  A407.[4]  The City also projected that it would

complete all CPAT testing for Exam 7001 candidates in 2020.  A330.

_____

(...continued)
actually summoned approximately 2400 candidates (every candidate in score
bands of 102 or higher).  A789-A790; see also Doc. 1877, at 12-13.

[4]  This second round of testing reached all candidates in the 101 and 100
score bands—approximately 3000 candidates.  A407.

- 14 -

As a result, in just the first year of the life of the Exam 7001 eligible list, the City called approximately 5400 out of the approximately 7680 candidates it projected it would need to call in order to fill all eight academy classes during the eligible list's anticipated four-year life.  See A404, A407, A716.  The City expected approximately 1800 of these candidates would make it from the CPAT to appointment to the academy.  See A404, A716.  However, the City could place only 640 successful candidates into the academy in a typical year.  See A404, A716.  Thus, the remaining successful candidates (approximately 1200) could wait more than a year between taking the CPAT and entering the academy, with some having to wait as long as 27 months.  SPA4; see also A399-A400.

Notably, the number of candidates from the Exam 7001 list the City called for the CPAT was more than "twice the size of the largest groups called from the Exam 2000 list."  SPA4; see also A722-A723, A764-A765.[5] Furthermore, successful Exam 2000 candidates had a maximum wait time of 16

---

[5]  Before the first academy class in July 2013, the City had called 868 candidates for the CPAT (530 from Exam 2000 and the remaining candidates from another list not at issue here).  A389, A722.  Between the first and second academy classes for Exam 2000 in January 2014, the City had called 1381 candidates to take the CPAT (with 821 of those candidates coming from the Exam 2000 eligible list and the remainder from the other list).  A389, A722.

months between the CPAT and entering the academy.  SPA4; see also A399-A400.

As the Monitor later explained, the City's change to its initiation of the CPAT stage had the potential to exacerbate attrition.  See A409-A412, A730. The increased volume of candidates may have exceeded the City's resources to provide candidate support, which is essential to mitigating candidate attrition. See A409-A412.  For those who pass the CPAT, the increased wait times between the CPAT and entering the academy may also contribute to a candidate's loss of fitness prior to their medical evaluation (including the stairmill test), which is required to enter the Academy.  See A409, A730.  These concerns about the City's decision to call up more than double the number of candidates to take the CPAT at a single time required careful advance consideration and planning (as well as Monitor approval) that did not happen. See A409-A412.

> b.    *Discovery Of The City's Change To The CPAT Stage*

At a July 2019 status conference, plaintiffs-intervenors voiced concern to the district court about the high volume of candidates from the Exam 7001 eligible list called to take the CPAT.  A278.  In particular, they noted that based on the first two rounds of CPAT processing, nearly "two-thirds" of all candidates the City expected to need during Exam 7001's anticipated four-year

- 16 -

life would be called to take the CPAT in just the first year. A278; see also p. 14, *supra* (City called approximately 5400 candidates out of the 7680 projected total).[6] Given the ongoing concern about the need to mitigate attrition at the CPAT stage, plaintiffs-intervenors argued that the volume of candidates called to date required quick action to avoid any increased attrition before candidates take the CPAT. A280.[7] After this status conference, the Monitor and the other parties sought more information from the City about the high volume of candidates called for the CPAT, particularly as compared to the Exam 2000 hiring process. A330.

At the next status conference in October 2019, plaintiffs-intervenors continued to press their concerns. They raised two particular issues to the district court: (1) the "big jump" in candidates (much more than double) processed for the CPAT for Exam 7001 as compared to Exam 2000 during the same time frame; and (2) whether the City undertook any planning to mitigate attrition in light of this increased number of candidates. Doc. 2079, at 39-40.

---

[6] Due to the Covid-19 pandemic, the City has sought Monitor approval to extend the life of the Exam 7001 eligible list. See, *e.g.*, Doc. 2029, at 8-9.

[7] In response to concerns about whether the City had appropriate resources for this volume of candidates to mitigate any attrition before the CPAT, the district court urged the City to consider adding a second location and additional dates for CPAT training. A284-A290. In August 2019, the City offered training sessions at a second location. A717.

- 17 -

After the conference, the court directed the Monitor to provide a status report regarding the City's "acceleration of CPAT testing." A399, A717; see also Doc. 2079, at 40-41.

Following the October 2019 status conference, the United States provided its own analysis suggesting that the City had changed its approach to the CPAT stage by calling enough Exam 7001 candidates to fill *two* academy classes simultaneously. A393; see also A442-A443. For its part, the City agreed that it had called enough candidates to take the CPAT to fill two academy classes for Exam 7001 but denied that any differences in the numbers of candidates processed for the two exams were attributable to a change in policy. A404; see also A443 (discussing City's denials of any change in discussions before the Monitor).

5.    *Proceedings Before The Monitor And The District Court*

In November 2019, the Monitor filed his report regarding the acceleration of CPAT testing, as directed. A398-A415. The Monitor found that "the City never called enough candidates to fill two [academy] classes at one time" during the CPAT stage of Exam 2000 processing and that the "City does not appear to have conducted an analysis of the likely impact on attrition of the larger number of candidates who would be processed at once" for Exam 7001. A405, A411; see also A718. The City objected, requesting that the district

court reject the Monitor's report and remand the matter back to the Monitor. A425-A434.  At a subsequent status conference in January 2020, the United States and plaintiffs-intervenors requested that the district court find that the City violated paragraph 16 of the MRO by failing to seek approval from the Monitor before making a change to its use of the CPAT.  A477-A478, A483.  In response, the court directed the Monitor to make a recommendation in the first instance regarding any violation of the remedial order.  A489.  The United States and plaintiffs-intervenors requested the Monitor make a finding that the City violated paragraph 16 of the MRO.  A738-A759, A762-A769.

     a.    *The Monitor's Recommendation*

After further efforts to resolve the issue informally proved unsuccessful and after additional briefing from the parties, the Monitor filed his recommendation with the district court in January 2021.  A713-A734.  The Monitor recommended that the court find that the City had violated paragraph 16 of the MRO with respect to obtaining advance approval of a change to the CPAT stage for the Exam 7001 hiring process.  A728.[8]  The Monitor noted that

---

[8]  Plaintiffs-intervenors also sought a finding that the City violated Paragraph 19 of the MRO, but the Monitor declined to make such a finding. A728-A731.  Paragraph 19 requires the City to take "all steps necessary to eliminate any policies and procedures that are not job related or required by business necessity and either have a disparate impact on [B]lack and Hispanic firefighter candidates or perpetuate the effects of said disparate impact."  A247.

- 19 -

neither the United States nor the plaintiffs-intervenors sought a finding of contempt, although he agreed, as they suggested, to apply this Court's test for civil contempt, set forth in *King* v. *Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995), in determining whether the City violated the MRO. A719. The Monitor also noted that no party had argued that paragraph 16 was ambiguous. A721.

The Monitor recommended specific remedies for the district court to order under Paragraph 52 of the MRO. A731-A734. This relief included, in response to a proposal by the United States, a requirement that the City "produce a flow chart or written summary of the firefighter hiring process," including the "steps of the hiring process" and "the key decisions that go into executing each step." A731. The Monitor further recommended, as requested by plaintiffs-intervenors, that the City provide additional support to Black firefighter candidates who had taken and passed the CPAT, but face increased wait times due to the timing of their CPAT exam. A733-A734. These supports include: opportunities to maintain fitness and practice the stairmill (which is part of the medical evaluation); monthly communications with candidates about their wait time; conducting a focus group with candidates to gather suggestions to improve retention and preparation; and a "written summary [from the City]

- 20 -

discussing the effectiveness of its various attrition mitigation mechanisms" and the City's efforts directed to this group of candidates. A733-A734.

The City filed a timely objection to the Monitor's recommendation. A903-A920. As relevant here, the City objected to the Monitor's finding that the City violated paragraph 16 of the MRO. A903-A912. The United States objected to the Monitor's recommended relief to the extent that it did not apply to both Black and Hispanic candidates who faced increased wait times as a result of the City's changed policy in conducting the CPAT. A874-A875.

### b.    *The District Court's Order*

After conducting a *de novo* review, the district court issued an order in June 2021 substantially adopting the Monitor's recommendation. SPA2-SPA14. The court explained that "[t]o determine whether the City breached the MRO," the Monitor employed the legal standard for contempt of a court order as set out in *King*, 65 F.3d at 1058. SPA5. As the district court stated, its "de novo review follows the same analysis." SPA5. Applying *King*'s three-factor test, the court found that the City had violated paragraph 16 of the MRO. SPA4-SPA11.

Applying the first *King* factor, the district court found that paragraph 16 "unambiguously requires the City to obtain the Monitor's approval before taking any 'step' in the hiring process for entry-level firefighters," including

"any decision to alter the process by which the City calls candidates for CPAT testing." SPA6-SPA7. As the court explained, the CPAT "has long been a focus of this litigation because it is a stage at which many candidates drop out of the process, and at which improved communication and recruitment practices could pay large dividends in terms of hiring entry-level firefighters without family and social ties to the FDNY." SPA6-SPA7.

Next, the district court ruled that the United States and plaintiffs-intervenors satisfied the second *King* factor by showing by clear and convincing evidence that the City failed to comply with the MRO. SPA7-SPA10. In particular, the court found that the "City doubled the number of candidates that it called for CPAT testing at a time," which was a "significant change to the hiring process that was undertaken without" Monitor approval. SPA8. In reaching this conclusion, the court rejected the City's arguments that the United States and plaintiffs-intervenors had "reverse engineer[ed]" the City's data to create a conflict, that the Monitor failed to properly credit the City's declaration that it had not made any changes, and that the City had given prior notice to the Monitor regarding its intent to call candidates to take the CPAT for two academy classes simultaneously. SPA8-SPA10.

Finally, under the third *King* factor, the district court held that the City did not "diligently attempt[] to comply" with the MRO in a reasonable manner

- 22 -

because "it did not seek the Monitor's approval before it made a significant change to the entry-level firefighter hiring process." SPA10. In so holding, the court noted that it was not necessary to find the City's breach of the MRO was willful, and concluded that the City's "good faith" did not relieve it from a finding that it had violated the MRO. SPA10.

To remedy this breach, the Court adopted the Monitor's recommended relief but expanded the targeted measures to include both Black and Hispanic candidates, as requested by the United States. SPA12-SPA14.

The City timely appealed. Doc. 2046. On appeal, the City challenges only the district court's finding of an MRO violation and not the remedies it ordered, as the City agrees that the district court had the authority to order these measures under the MRO, even without the finding. Br. 2, 17, 25.

## SUMMARY OF ARGUMENT

The City appeals the district court's determination that the City violated the MRO—even though it does not object to the remedy—out of a concern about how this finding may affect future disputes that are not before this Court. As explained above, this Court has no appellate jurisdiction to entertain that challenge now. But if the Court disagrees and reaches the merits, the only question here is whether the district court abused its discretion in ruling that the City violated paragraph 16 of the MRO when it failed to seek Monitor approval

for its policy decision to change how it initiated the CPAT for Exam 7001. The court did not abuse its discretion.

To start, paragraph 16 clearly and unambiguously obligated the City to seek Monitor approval for policy decisions regarding the initiation of the CPAT stage of the hiring process, including decisions that could have an effect on the attrition of Black and Hispanic candidates. This is evident from the MRO's delineation of the steps requiring advance approval, as well as from other provisions making clear the MRO's intent to give the Monitor authority to oversee whether the City is meeting its obligations to mitigate candidate attrition. In proceedings before the Monitor, the City did not contest that paragraph 16 required it to obtain Monitor approval in advance of any change to the hiring process.

Second, the City does not dispute that it did not seek Monitor approval before deciding to call candidates to take the CPAT for Exam 7001 in sufficient numbers to fill two academy classes simultaneously. Instead, in proceedings before the Monitor, the City repeatedly denied that it had made a change to past practice. Given its position on this point, the City did not attempt to diligently comply with its obligations under paragraph 16 of the MRO in a reasonable manner. It makes no difference to the analysis whether the City otherwise complied with the MRO during the monitorship or whether it violated

- 24 -

paragraph 16 as a result of an inadvertent oversight rather than with intent to contravene the MRO. Either way, the district court's determinations that the City violated paragraph 16—and that the City failed to diligently comply with paragraph 16—are correct.

## ARGUMENT

### THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY FINDING THAT THE CITY VIOLATED PARAGRAPH 16 OF THE MODIFIED REMEDIAL ORDER

The City does not object to, and indeed is in the process of implementing, the remedy ordered by the district court in this case. Nonetheless, the City has appealed the district court's finding that the City violated the MRO. It did so because of its concerns about the implications of this finding for any future determination regarding whether and when the district court should terminate the MRO and its jurisdiction in this case. But that issue is not before this Court, and this is not the time or the place to pre-litigate it. The only question here—if this Court has jurisdiction to consider it now, which it does not—is whether the district court abused its discretion in finding that the City violated paragraph 16 of the MRO. As discussed below, the court did not.

A. *Standard Of Review*

The district court applied the standard for civil contempt set forth in *King* v. *Allied Vision, Ltd.*, 65 F.3d 1051 (2d Cir. 1995). SPA5; Br. 18. This Court

reviews a decision based on this standard for an abuse of discretion. *United States* v. *Local 1804-1, Int'l Longshoremen's Ass'n*, 44 F.3d 1091, 1095 (2d Cir. 1995).

Because "[i]t is peculiarly within the province of the district court to determine the meaning of its own order," this Court "accord[s] substantial deference to a district court's construction of its own order[]," while also "acknowledging that the construction cannot be based on an error of law." *Next Invs., LLC* v. *Bank of China*, 12 F.4th 119, 128-129 (2d Cir. 2021) (citations and internal quotation marks omitted). To that end, this Court reviews "[p]urely legal questions" *de novo*, but accepts the district court's factual findings "unless  *  *  *  clearly erroneous." *Id.* at 129 (citation omitted).

B.   *The District Court Correctly Found That The City Violated Paragraph 16 Of The MRO Based On The Three-Factor Test In* King

Under this Court's test in *King*, the moving party must show:  (1) that the order is "clear and unambiguous" with respect to the contemnor's obligations; (2) that proof of "noncompliance" is clear and convincing; and (3) that "the contemnor has not diligently attempted to comply in a reasonable manner." *King*, 65 F.3d at 1058.  Based on these three factors, the district court properly ruled that the City violated paragraph 16 of the MRO by more than doubling the number of candidates called for the CPAT stage of the hiring process at a

- 26 -

single time, so that the City could fill two academy classes simultaneously rather than one.

1.    Under The First *King* Factor, The District Court Correctly Found That Paragraph 16 Of The MRO Was "Clear And Unambiguous"

To determine under the first *King* factor whether the MRO is "clear and unambiguous" with respect to the City's obligations, this Court must "ascertain from the four corners of the [MRO] precisely what acts are forbidden." *King*, 65 F.3d at 1058 (citation omitted). Paragraph 16 requires that the City "shall not take any step in any process for the selection of entry-level firefighters, or use any examination as part of such process, without first obtaining the approval" of the Monitor. A246.

The City did not dispute below that paragraph 16 requires the City to seek approval of the Monitor before *changing* any step in its hiring process from Exam 2000. See, *e.g.*, A775, A810; see also A721. No doubt this is the reason the City remained insistent in its briefing to the Monitor and the district court that no change happened at all. See, *e.g.*, A427, A430-A431, A775-A777, A908-A909.

On appeal, however, the City has essentially switched gears. Now, it argues primarily that its policy decision to initiate the CPAT stage for certain candidates based on the number of academy classes the City sought to fill at once is not a "step" governed by the MRO. Br. 19-22. But the district court

correctly ruled that paragraph 16 of the MRO "unambiguously requires the City to obtain the Monitor's approval before taking any 'step' in the hiring process for entry-level firefighters, which includes any decision to alter the process by which the City calls candidates for CPAT testing."  SPA6.

      *a.*     *Paragraph 11 And Additional Provisions Of The MRO Make Clear The City's Obligations Under Paragraph 16*

The four corners of the MRO, including paragraph 11 and those paragraphs detailing the Monitor's role in ensuring the City's compliance with the MRO, provide substantial context clarifying the City's obligations in paragraph 16.  When read in this context, paragraph 16 necessarily requires the City to seek approval for any policy decisions about how it initiates the CPAT stage of the hiring process that may have a significant impact on attrition for Black and Hispanic candidates.

      *i.*     *Paragraph 11 Clearly Indicates That The "Steps" Governed By The MRO Include Policy Decisions Initiating The CPAT Stage Of The Hiring Process*

Paragraph 16 forbids the City from taking "any step" in any "process for the selection of entry-level firefighters" without first obtaining Monitor approval.  Paragraph 11 broadly defines the phrase "process for the selection of entry-level firefighters" as "*any and all* steps taken by the City of New York to hire entry-level firefighters" and provides a non-exhaustive list of examples. A244-A245 (emphasis added).

First, one of the examples listed is assessment of candidates' "physical fitness or ability."  A244-A245.  This is precisely what the CPAT is:  the screening device by which the City "assess[es] an entry-level firefighter candidate's physical fitness or ability."  A244.  It could not be any clearer that the CPAT is part of a process subject to the MRO.

Second, paragraph 11 clarifies that the MRO governs multiple steps relating to the City's use of each of these examinations or assessments, and not just the examination or assessment itself.  See A244-A245.  For example, paragraph 11 lists several steps that relate to the City's use of a written (or computer-based) examination, including, among others:  "issuing a 'Notice of Examination' * * * for any person to apply" to take an examination; "administering" the examination; and determining that a candidate "has passed or failed" the examination.  A244.  As this set of examples illustrates, the MRO reaches many steps for each assessment, like those involved in the City's use and implementation of the CPAT.[9]

---

[9]  That the MRO offers more specific examples of steps with respect to the written examination than for other selection devices comes as no surprise given that the litigation provided a significant factual record about the City's use of a written examination.  See Docs. 294, 505.  However, the MRO makes clear that the other steps of the City's hiring process would be addressed in the City's work with the Monitor.  See, *e.g.*, A251 (ordering City to conduct "a comprehensive top-to-bottom assessment of all steps in its process for the selection of entry-level firefighters").

- 29 -

Third, paragraph 11 also instructs that the steps in the City's hiring process governed by the MRO include the City's policy decisions about how it uses an assessment, including the CPAT, to hire entry-level firefighters. Significantly, many of the examples in paragraph 11 are framed in terms of the City's "determining" how to use an examination or assessment. A244-A245. The plain meaning of "determine" is to "*officially* decide" or "establish  *  *  * *with authority*."  *Determine*, Webster's Dictionary (online ed. 2021), https://www.merriam-webster.com/dictionary/determine (emphasis added). The use of this term thus suggests, at a minimum, that the City's policy determinations about its assessments—including changing the number of academy classes for which it calls candidates to take the CPAT at the same time—are subject to the MRO.

Finally, paragraph 11 establishes that the MRO governs decisions regarding the circumstances under which applicants will be called for an examination or other assessment.  In particular, two examples in the list relate specifically to the decisions involving the initiation of a stage in the hiring process:  (1) "issuing a 'Notice of Examination' to open an application period for any person to apply" to take the examination to become an entry-level firefighter; and (2) "determining to begin investigating any entry-level firefighter candidate's background or eligibility to be hired."  A244.  Although

- 30 -

these particular steps refer to the initiation of the written examination and

background check stages, respectively, it follows by analogy that the initiation

of the CPAT stage of the hiring process likewise is a "step" governed by the

MRO.

For these reasons, the district court correctly concluded that paragraph

16, considered in light of paragraph 11, clearly and unambiguously requires the

City to seek approval for policy decisions about how it initiates the CPAT stage

of the hiring process.  SPA6-SPA7.

> ii.    *MRO Provisions Regarding The Monitor's Duties Also Show That Policy Decisions In The Hiring Process Affecting Attrition Are Subject To Monitor Approval*

Other provisions in the MRO specifying the Monitor's responsibilities

reinforce the conclusion that the City had to seek approval here.  One of the

Monitor's duties is "[m]onitoring  *  *  *  the City's compliance with its

obligations under" the MRO.  A259.  These obligations include, among others,

that the City shall "eliminate all policies and procedures that are not job related

or required by business necessity and either have a disparate impact on [B]lack

and Hispanic firefighter candidates or perpetuate the effects of said disparate

impact."  A247 (paragraph 19).  The MRO also specifically directs the Monitor

to oversee the City's efforts to "mitigate and diminish rates of voluntary

candidate attrition between different steps of the City's process for the selection of entry-level firefighters." A250-A251 (paragraph 31).

These provisions show why the district court correctly read paragraph 16 to require the City to seek advance Monitor approval before making the policy decision to more than double the number of candidates called at the same time to take the CPAT. That decision had "significant effects," as the district court found, increasing the maximum candidate wait time following the CPAT from an estimated 16 months to 27 months, which could exacerbate attrition. SPA7.

\* \* \*

In short, paragraph 16, read in the context of the MRO as a whole, clearly and unambiguously requires the City to seek advance approval from the Monitor before making a policy decision about the initiation of the CPAT—such as "deci[ding] to alter the process by which the City calls candidates for CPAT testing"—particularly so when, as here, such a decision may have a significant impact on the attrition of Black and Hispanic candidates. SPA5-SPA7.

> b. *The City's Arguments To The Contrary Are Not Persuasive*

The City's arguments challenging the district court's ruling on the first *King* factor are unavailing.

- 32 -

First, the City claims that the district court's interpretation of the MRO has "no home in the 'four corners' of the MRO," and regardless, would fail to give the City adequate notice of its obligations under the MRO. Br. 22. As explained above, the City is wrong in both respects. To support this argument, however, the City casts its policy decision about calling candidates for the CPAT as too "granular" in comparison to the steps exemplified in paragraph 11. Br. 23.

But the City's "granularity" defense is belied by its own prior conduct. The City admits that it previously sought and received Monitor approval for even the smallest of changes in hiring entry-level firefighters (though it also claims in its brief, without elaboration, that some of those approvals were not required under the MRO). Br. 20, 28; see also, *e.g.*, A378 (referring to submission of revised manual, instructions, and informational materials to Monitor for approval). Moreover, however much the City seeks to minimize to the Court the importance of its CPAT decision, its own evidence shows that the decision was made by Assistant Commissioner Marie Giraud, a top FDNY official, along with other City personnel. A787-A789. Thus, as the district court found, "determining how many candidates to call for CPAT testing represented a policy decision at the Department level," rather than a "minor

- 33 -

individual procedural step[]" like rescheduling an individual candidate's test date.  SPA7.

Next, the City cites the length of time it took for the United States, plaintiffs-intervenors, the Monitor, and the district court to assert that the City had violated paragraph 16 as evidence that the City's obligations were unclear. Br. 24-25.  But this argument ignores that a finding of an MRO violation, with whatever sanctions might accompany it, is a remedy of last resort.  The MRO contemplates that the parties will attempt to resolve disputes with the assistance of the Monitor in the first instance.  A259-A260.  Indeed, the parties and the Monitor attempted to resolve this conflict for six months before the United States and plaintiffs-intervenors first requested in January 2020 that the district court find that the City violated the MRO.  And the United States and plaintiffs-intervenors made this request only after the Monitor issued an initial report finding that the City made a policy decision to change the rate at which it called candidates for the CPAT (A398-A415), which the City continued to dispute (A426-A434).  Thus, the timing of requests to find the City in violation of the MRO does not suggest that the City's obligations under paragraph 16 were unclear.

Similarly, this Court should reject the City's suggestion that the timing of these requests by the United States and plaintiffs-intervenors evidences an

intent by these parties to "leverage" the district court's finding of an MRO violation "to prolong the monitorship." See Br. 2, 13. Rather, the circumstances of this dispute bear on whether dissolution will be appropriate based on the standards set out in the MRO itself. See A264-A265. For example, the district court will retain jurisdiction until the City has demonstrated that it has "established policies, procedures, and other institutional mechanisms  *  *  *  sufficient to ensure that the City complies with all provisions" of equal employment law. See A265 (paragraph 74(c)). This dispute revealed that the City did not have adequate mechanisms in place to preserve institutional memory about its past hiring processes, as further discussed below. The City also refused to admit that it changed its selection process, in the face of clear evidence to the contrary. Thus, this dispute has highlighted a legitimate concern as to whether the City's policies and procedures suffice to ensure its compliance with equal employment opportunity laws without a need for further court supervision. This will remain a central inquiry going forward, even in the absence of a formal finding of an MRO violation.

Finally, the City argues that the remedy requiring it to produce a written summary of the hiring process undermines the Court's finding that the City's obligations under paragraph 16 are clear and unambiguous. Br. 25-26. Not so.

- 35 -

As an initial matter, the City's argument is wrong because the City conflates a lack of clarity about the substance of its past practice with a lack of clarity about whether a change to the practice requires approval. Indeed, this dispute evidenced "confusion within the City" about its past hiring processes (A767), possibly because of turnover in personnel involved in hiring, including the Assistant Commissioner of the FDNY charged with decision-making authority over this process (A784-A785, A810). As the district court found, Assistant Commissioner Marie Giraud lacked "firsthand knowledge of the FDNY's hiring practices in place before she assumed her role in September 2019" (SPA9), and the City could not supply any evidence to rebut the other parties' contentions that it changed its hiring process from Exam 2000 (SPA8-SPA10). Thus, the written summary remedy serves to "institutionalize" the hiring process for all City personnel charged with implementing it, both by identifying the steps in the process (*e.g.*, the decision regarding how many academy classes for which to call candidates at once) and the content of those steps (*e.g.*, calling candidates for two classes). A767.

Apart from the need for the City to institutionalize its hiring process more formally, the required summary serves the added important purpose of enabling not only future FDNY officials but also the Monitor, plaintiffs-intervenors, and the United States—who lack first-hand knowledge of the

City's hiring process—to know whether the City is making changes that require

Monitor approval. Such a remedy would go far to "eliminat[e] any confusion

within the City or between the City, other Parties, and Monitor about the exact

processes in place." A767. The goal, as the district court put it, is "to avoid

another dispute like this one." SPA13.

2. *Under The Second* King *Factor, The District Court Correctly Found Proof Of The City's Noncompliance With Paragraph 16*

Next, the district court correctly ruled that the United States and plaintiffs-

intervenors met their burden to show by clear and convincing evidence that the

City failed to comply with paragraph 16 of the MRO. In particular, the court found

that the "the City doubled the number of candidates it called for CPAT testing at a

time," and that this "significant change" was "undertaken without the approval of

the Monitor." SPA8. On appeal, the City contests this finding as to the second

*King* factor only to the extent that it rests on the court's determination that the

MRO was clear and unambiguous with respect to the City's obligations. See Br.

18 (faulting district court for its findings on the first and third *King* factors only).

For the reasons explained in Section B.1. above, that determination was correct.

3. *Under The Third* King *Factor, The District Correctly Found That The City Did Not Diligently Attempt To Comply With Paragraph 16 In A Reasonable Manner*

Finally, the district court correctly ruled that the City failed to diligently

comply with paragraph 16 of the MRO in a reasonable manner. SPA10-SPA11.

In addition to failing to comply with paragraph 16, the City also did not take any corrective action for its failure to seek approval for its changed approach to the CPAT stage, even after the other parties raised the issue. For example, the City could have halted the ongoing CPAT processing and worked with the parties and the Monitor to ensure that sufficient supports were in place to mitigate attrition and obtain the necessary approval to continue. Instead, the City continued to deny it made any change at all until July 2020, nearly a year after plaintiffs-intervenors first raised their concerns about the rate of CPAT testing. See A719, A726. Even if the City believed that it had not departed from past practice, its persistence on this course, despite being presented with its own data as proof of the change, amply shows that the City did not diligently attempt to comply with paragraph 16 in a reasonable manner here.

The City challenges the district court's ruling on the third *King* factor on two grounds. First, the City argues that the court erred by focusing on a single instance of noncompliance without regard to the City's general history of compliance with the MRO. Br. 26-31. Second, the City faults the court's ruling for not factoring in that any breach was inadvertent and occurred in good faith. Br. 31-33. Neither argument warrants reversal here.

> a. *The District Court Did Not Err By Focusing On The City's Specific Conduct In This Dispute Rather Than On Its Overall Compliance With The MRO*

The City's overall history of compliance with the MRO does not preclude a finding that it violated the MRO in the specific circumstance here. The City has not cited any controlling precedent to suggest otherwise. Instead, the City suggests that a "substantial compliance" standard, which this Court has not adopted, applies here and that it refers to compliance with the MRO overall and not with respect to the violation at issue. Br. 26-27. The City is wrong.

In urging that the third *King* factor requires the district court to consider the City's alleged substantial compliance with the MRO as a whole, the City relies on *Yurman Studio, Inc.* v. *Castaneda*, No. 1:07cv1241, 2009 U.S. Dist. LEXIS 13870, at *7 (S.D.N.Y. Feb. 23, 2009), a district court case that applied the "substantial compliance" standard in contempt proceedings. *Yurman* is entirely unlike this case: it involved two preliminary injunctions against use of a trademark, and not an extensive remedial order like the one in place here. 2009 U.S. Dist. Lexis 13870, at *1. And even in *Yurman*, the contemnor's compliance with the injunction at issue in other instances did not preclude a contempt finding. *Id.* at *12-16.[10]

---

[10] *Yurman*, in turn, relied in part on *Juan F.* v. *Weicker*, 37 F.3d 874, 878-879 (2d Cir. 1994), cert. denied, 515 U.S. 1142 (1995), which is inapposite.

(continued...)

- 39 -

The City's citations to concurring opinions in two Supreme Court cases are similarly unavailing on this point.  Br. 27-28.  In neither *International Union, United Mine Workers of America* v. *Bagwell*, 512 U.S. 821 (1994), nor *Missouri* v. *Jenkins*, 515 U.S. 70 (1995), did the Supreme Court analyze the merits of whether a party violated a court order.  *Bagwell* addressed whether contempt fines required a jury trial, and *Jenkins* involved a direct challenge to a court's remedial orders.  Neither type of challenge is at issue here; nor do these cases address how this Court should assess the district court's findings with respect to the third *King* factor.

The City also asserts that even if the third *King* factor focuses on the specific provision of the MRO at issue here, the City still "substantially complied" because it sought the Monitor's approval to begin the CPAT stage and "provided data about how many candidates would be called per round" to the Monitor.  Br. 27.  But as the district court found, while providing this data to the Monitor allowed the change in policy to be discovered, it does not "speak[] to the issue at hand:  *  *  *  [the City] did not seek the monitor's

---

(...continued)

*Weicker* merely contemplated the relevance of a party's substantial compliance to contempt proceedings.  It did not address whether this standard, if adopted in the context of applying the *King* factors, would apply to overall compliance with an extensive remedial order rather than compliance with an order's specific requirements with respect to a particular dispute.  *Ibid.*

approval before it made a significant change to the entry-level firefighter hiring process." SPA10. The City cannot accomplish the requirements of paragraph 16 by inference.

> b. *The District Court Did Not Err By Finding The City Failed To Diligently Comply With The MRO Even Though The City's Failure To Comply May Have Been Inadvertent*

Even if the City's breach of the MRO occurred inadvertently and in good faith, this would not preclude the district court's finding that the City failed to diligently comply with the MRO. SPA10-SPA11. Importantly, the *King* standard does not require the district court to find that "the violation was willful" or undertaken in bad faith. *Paramedics Electromedicina Comercial, Ltda.* v. *GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 655 (2d Cir. 2004); see also *EEOC* v. *Local 638*, 753 F.2d 1172, 1178 (2d Cir. 1985), aff'd, 478 U.S. 421 (1986).

The City cites *Perez* v. *Danbury Hospital*, 347 F.3d 419, 425 (2d Cir. 2003), for the proposition that whether the City took "any direct steps to contravene" the MRO is relevant to the third *King* factor. Br. 33. But *Perez*'s inclusion of this language was dicta, since it held the ruling failed on the first *King* factor. *Perez*, 347 F.3d at 424-425. In any event, this quoted language did not purport to address the culpability or the inadvertence of the contemnors' behavior in *Perez*—this Court was referring to the fact that those

involved in the challenged conduct were not actually agents of the contemnors, who themselves had not taken "any direct steps to contravene" the decree at issue here. *Ibid.* The contemnors' alleged "good faith" had nothing to do with it. Here, of course, it was the City itself that failed to comply diligently with paragraph 16.

## CONCLUSION

This Court should affirm the district court's determination that the City violated paragraph 16 of the MRO.

Respectfully submitted,

KRISTEN CLARKE
  Assistant Attorney General

s/ Barbara Schwabauer
BONNIE I. ROBIN-VERGEER
BARBARA SCHWABAUER
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 305-3034

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(g):

1. This brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(7)(B) and Local Rule 32.1(a)(4) because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), the brief contains 9238 words.

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because the brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2019 in Times New Roman, 14-point font.

s/ Barbara Schwabauer
BARBARA SCHWABAUER
Attorney

Date: February 17, 2022

# CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2022, I electronically filed the foregoing BRIEF FOR THE UNITED STATES AS APPELLEE with the United States Court of Appeals for the Second Circuit by using the CM/ECF system. All participants in this case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

s/ Barbara Schwabauer
BARBARA SCHWABAUER
Attorney
