# 21-1929-cv

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

VULCAN SOCIETY, MARCUS HAYWOOD, CANDIDO NUNEZ,
ROGER GREGG, JAMEL NICHOLSON, RUSEBELL WILSON,
KEVIN WALKER and KEVIN SIMPKINS,

*Plaintiffs-Intervenors-Appellees,*

– v. –

CITY OF NEW YORK,

*Defendant-Appellant,*

NEW YORK CITY FIRE DEPARTMENT, NEW YORK CITY
DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICES,
MAYOR MICHAEL R. BLOOMBERG, NEW YORK FIRE
COMMISSIONER NICHOLAS SCOPPETTA,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-INTERVENORS-APPELLEES

SHAYANA KADIDAL
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th Floor
New York, New York 10012
(212) 614-6438

DANA E. LOSSIA
ROBERT H. STROUP
REBEKAH COOK-MACK
JESSICA I. APTER
LEVY RATNER, P.C.
80 Eighth Avenue, 8th Floor
New York, New York 10011
(212) 627-8100

*Attorneys for Plaintiffs-Intervenors-Appellees*

## **CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, through counsel, the

Vulcan Society hereby certifies that it has no parent corporation and that no publicly

held corporation owns 10% of its stock.


Dated:  New York, New York
          February 17, 2022


                          LEVY RATNER, P.C.

                          */s/ Dana Lossia*_____
          By:    Dana Lossia


- i -

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT......................................................... i

TABLE OF AUTHORITIES................................................................................... iii

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF FACTS .......................................................................................1

    A.   The 2013 Modified Remedial Order and Order Appointing Court Monitor ..........................................................................................................1

    B. Background and Significance of the Candidate Physical Ability Test 2

    C. The City's Violation of the Modified Remedial Order.........................4

    D. Procedural Background and Order Finding the City Violated the Modified Remedial Order .............................................................................7

ISSUES FOR REVIEW ........................................................................................10

SUMMARY OF ARGUMENT.............................................................................10

STANDARD OF REVIEW ..................................................................................12

ARGUMENT.........................................................................................................15

I.     THIS COURT LACKS APPELLATE JURISDICTION. ...........................15

II.    THE DISTRICT COURT CORRECTLY FOUND THAT ITS OWN MODIFIED REMEDIAL ORDER CLEARLY AND UNAMBIGUOUSLY REQUIRED THE CITY TO OBTAIN ADVANCE APPROVAL BEFORE DOUBLING THE NUMBER OF CANDIDATES IT CALLED FOR CPAT TESTING AT ONE TIME. .....................................................................................20

III.   THE DISTRICT COURT CORRECTLY FOUND THAT THE CITY DID NOT DILIGENTLY ATTEMPT TO COMPLY WITH THE MRO WHEN IT DID NOT SEEK MONITOR PRE-APPROVAL BEFORE DOUBLING THE NUMBER OF CANDIDATES IT CALLED FOR CPAT TESTING AT ONE TIME.....................................................................................................................23

    A.   The District Court Correctly Found That The City Did Not Diligently Attempt To Comply With The MRO With Respect To The Change in CPAT Processing. .............................................................................23

    B.   The City's Breach Was So Central To The MRO And The Purpose Of The Monitorship, That It Cannot Be Said To Have Substantially Complied With The MRO. ...................................................................................26

CONCLUSION .....................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Berger v. Heckler*,
    771 F.2d 1556 (2d Cir. 1985) .................................................................13, 14

*Carson v. Am. Brands, Inc.*,
    450 U.S. 79 (1981)........................................................................................18

*Class v. Norton*,
    376 F. Supp. 496 (D. Conn. 1974), *aff'd in part and rev'd in part on
    other grounds*, 505 F.2d 123 (2d Cir. 1974).................................................14

*Cohen v. Beneficial Industrial Loan Corp.*,
    337 U.S. 541 (1949).........................................................................15, 16, 18

*E.E.O.C. v. N.Y. Times Co.*,
    196 F.3d 72 (2d Cir. 1999) ...........................................................................14

*Firestone Tire & Rubber Co. v. Risjord*,
    449 U.S. 368 (1981).............................................................................16, 18

*Gardner v. Westinghouse Broad. Co.*,
    437 U.S. 478 (1978)....................................................................................18

*Int'l Bus. Machines Corp. v. United States*,
    493 F.2d 112 (2d Cir. 1973) .......................................................................16

*Int'l Silver Co. v. Oneida Cmty.*,
    93 F.2d 437 (2d Cir. 1937) .........................................................................19

*Juan F v. Weicker* ,
    37 F.3d 874 (2d Cir. 1994) .........................................................................25

*King v. Allied Vision, Ltd.*,
    65 F.3d 1051 (2d Cir. 1995) ....................................................11, 14, 20, 23

*Latino Officers Ass'n City of N.Y. v. City of N.Y.*,
    519 F. Supp. 2d 438 (S.D.N.Y. 2007) ...................................................23, 25

*Latino Officers Ass'n City of New York, Inc. v. City of New York*,
    558 F.3d 159 (2d Cir. 2009) .......................................................................17

*Latino Officers Ass'n City of New York, Inc. v. City of New York*,
    Case No. 99 Civ. 6558(LAK), Dkt. No. 256 (S.D.N.Y. Jan. 5, 2007)..........17

*Mohawk Indus., Inc. v. Carpenter*,
    558 U.S. 100 (2009)...................................................................................16

*New York State Urban Dev. Corp. v. VSL Corp.*,
    738 F.2d 61 (2d Cir. 1984) .......................................................................17

*New York v. Shore Realty Corp.*,
    763 F.2d 49 (2d Cir. 1985) .......................................................................17

*Next Investments, LLC. v. Bank of China*,
    12 F. 4th 119 (2d Cir. 2021) ...............................................................13, 23

*Perez v. Danbury Hosp.*,
    347 F.3d 419 (2d. Cir. 2003) ....................................................................24

*S. New England Tele. Co. v. GlobalNAPs Inc.*,
    624 F.3d 123 (2d. Cir. 2010) ...............................................................20, 22

*Sierra Club v. U.S. Army Corps. Of Engineers*,
    776 F.2d 383 (2d Cir. 1985) .....................................................................13

*Spallone v. U.S.*,
    493 U.S. 265 (1990)...................................................................................13

*Swint v. Chambers County Comm'n*,
    514 U.S. 35 (1995).....................................................................................16

*Truskoski v. ESPN, Inc.*,
    60 F.3d 74 (2d Cir. 1995) .........................................................................13

*United States v. N.Y.C. Dist. Council of N.Y.C.*,
    229 F. App'x 14, 2007 WL 1157143 (2d Cir. 2007)......................20, 22, 24

*United States v. O'Rourke*,
    943 F.2d 180 (2d Cir. 1991) .....................................................................17

*United States v. Victoria-21*,
    3 F.3d 571 (2d Cir. 1993) .........................................................................12

*United States v. Yonkers Bd. Of Educ.*,
    946 F.2d 180 (2d Cir. 1991) (per curiam...................................................18

*Utica College v. Gordon*,
    389 F. App'x. 71, 2010 WL 3157169 (2d. Cir. 2010)..................................23

*Vincent v. Local 294, Int'l Bhd. of Teamsters*,
424 F.2d 124 (2d Cir. 1970) ...........................................................17

*Will v. Hallock*,
546 U.S. 345 (2006).........................................................................15

**Statutes & Other Authorities:**

28 U.S.C. § 1291 .........................................................................1, 18

28 U.S.C. § 1292(a)(1).......................................................................18

Wright, Miller & Cooper, 16 Fed. Prac. & Proc. § 3917........................................16

## JURISDICTIONAL STATEMENT

Appellants assert jurisdiction only under 28 U.S.C. § 1291, providing for review of final judgments of the district courts.

## STATEMENT OF FACTS

A. <u>The 2013 Modified Remedial Order and Order Appointing Court Monitor</u>

The District Court's June 6, 2013 Modified Remedial Order and Partial Judgment, Permanent Injunction, and Order Appointing Court Monitor ("MRO") established procedures through which the City of New York ("City") would remedy the Fire Department's ("FDNY") long-standing discriminatory practices against Black and Hispanic firefighter applicants. J.A. 239-66. Paragraph 16 of the MRO provides, in relevant part, that:

> [t]he City of New York shall not take any step in any process for the selection of entry-level firefighters, or use any examination as part of such process, without first obtaining the approval of the Court Monitor."

J.A. 246.

Paragraph 11 of the MRO defines such processes inclusively and without limitation as "any and all steps taken by the City of New York to hire entry-level firefighters including, without limitation:… assessing an entry-level firefighter candidate's physical fitness or ability." J.A. 244.

Paragraph 52 of the MRO provides for a range of possible sanctions for violations, up to and including a finding of contempt:

A violation of the terms of this remedial order…. may be punished by court-ordered sanction if another party or the Court Monitor moves for such sanction. Such sanction may include, but is not limited to, an adverse inference, waiver of a privilege, grant or expedition of relief for the opposing party, and the use of contempt proceedings if the alleged violation is of sufficient gravity to warrant such proceedings.

J.A. 259.

Finally, Paragraph 54 sets forth the duties of the Monitor, including:

(b) Monitoring and reporting on the City's compliance with its obligations under this Order; [and]
(c) Facilitating the Parties' resolution of any disputes concerning compliance with their obligations under this Order, and recommending appropriate action by the court in the event an issue cannot be resolved by the Parties with the Court Monitor's assistance.

J.A. 259-60.

B. Background and Significance of the Candidate Physical Ability Test

The Candidate Physical Ability Test ("CPAT") is the City's first assessment of firefighter candidates' physical fitness and ability, and follows the City's administration of a computer-based written exam every four or five years ("Exam"), J.A. 505, 715, for example, Exam 2000 in 2012, J.A. 741, or Exam 7001 in 2017, J.A. 715. The CPAT is offered to cohorts of candidates in rounds typically once each summer and once each winter, in order to fill Fire Academy classes held each spring and fall. J.A. 715-16. The City relies on a three-to-one hiring ratio for determining the number of candidates needed to fill a single Academy class. Sp. App. 8. Once the City determines what Adjusted Final Average score ("AFA") needs to be reached

2

in order to invite three candidates for each position available, it invites all candidates with that AFA to take their CPAT. J.A. 330. This practice accounts for the voluntary attrition (i.e. withdrawal) and involuntary attrition (i.e. failure) that occurs at this and subsequent stages of evaluating firefighter candidates, including a stairmill test and a timed 1.5-mile run. J.A. 404, 447, 715; Sp. App. 4.

In 2018 the City provided the Court Monitor and Parties with an analysis of its hiring from the Exam 2000 civil service list, including analyses of attrition by race and hiring stage. J.A. 340. The data from Exam 2000 hiring and from the first round of CPAT testing of Exam 7001 candidates revealed that "the CPAT is the largest cause of attrition among all candidates…and the dominant factor in the disparity in attrition between [B]lack and [W]hite candidates." J.A. 328; *see also* 331, J.A. 517. Prior experience has also shown that CPAT is a stage at which additional supports such as training and encouragement have "the potential to significantly affect overall hiring rates for Black and Hispanic candidates." J.A. 714; *see also* J.A. 321-22, 331, 400, 402, 518. As the Monitor's experts have found, "preparation and familiarity with what to expect on the task are…significant factors." J.A. 328. Attendance at multiple training sessions greatly increases the probability of success. J.A, 331. City data shows that extra preparation and communication is particularly important for Black and Hispanic candidates who are less likely to have the "benefit of friends and/or family who can share their own

3

experience and guidance," J.A. 448, 714, with 70% of White candidates having family ties to incumbent firefighters, as compared to only 30% of Black candidates. J.A. 281, 315.

For these reasons, the CPAT has been a focus of the Parties' efforts to reduce Black and Hispanic attrition overall. J.A. 333, 714, Sp. App. 7. However, as described in the next section, these critical supports were not all fully developed or implemented when the City began calling Exam 7001 candidates to the CPAT. J.A. 400, 409-410.

C. The City's Violation of the Modified Remedial Order

In the summer of 2019, the City significantly changed the way it processed firefighter candidates through the CPAT. J.A. 410-11. Specifically, for the second round of CPAT testing of Exam 7001 candidates, which took place in the summer of 2019, the City called in approximately 3,000 candidates, J.A. 329, more than double the size of the largest groups called at one time from the Exam 2000 list, J.A. 405, to fill not one but two firefighter academy classes at one time, J.A. 329, 716, 725. This meant that approximately two thirds of Exam 7001 candidates who would be invited to take the CPAT during that list's four-year life had already been called by early September 2019. J.A. 400. The Monitor found that as a result of the City's change, Exam 7001 candidates were called "in larger groups and earlier in terms of the overall hiring process for the life of the list than Exam 2000 candidates," J.A.

4

330, and "the amount of time Exam 7001 candidates will have to wait between passing the CPAT and getting into the Academy has increased from a maximum of approximately 16 months for Exam 2000 to a maximum of approximately 27 months for Exam 7001," J.A. 399.

The City made this change without obtaining approval from or even alerting the Monitor. J.A. 448-49, 725-26. As the District Court observed at the January 27, 2020 status conference:

> [O]ver the years, we've had a very good effort by the parties to communicate with each other in advance of any steps that were taken, and so here, there's a unanimous view on the part of the plaintiffs and the Monitor that this was a surprise, and so obviously the message did not arrive if it was conveyed.

J.A. 490.

Rushing far more candidates than needed to fill the next Academy class through the CPAT in the summer of 2019 significantly reduced the number of Exam 7001 candidates who would benefit from improved anti-attrition measures based on an analysis of the prior CPAT round, J.A. 400, 409, 532, which the City did not deliver to the Monitor until June 18, 2019, J.A. 341, 532. Additionally, by the summer of 2019, the City had "identified or agreed to adopt" but had not yet instituted additional supportive measures for CPAT takers, J.A. 400, such as: "updated and improved CPAT-focused fitness tips," J.A. 322, 335,  and "add[ed] capabilities to its automated communications systems, including the ability to leave

5

voice messages for candidates and maintain records of robocalls in its ARCS database," J.A. 336, 410. Additionally, for the first two months of CPAT training, Randall's Island, not serviced by a single subway line, was the only site where candidates could access essential training, and the City did not make a more accessible site available until just one month prior to the September 2019 CPAT tests, J.A. 322, 403, 410, 519, 717, even though the City has acknowledged to the District Judge "the importance of attending at least seven to eight CPAT trainings," J.A. 277. This was also despite the long-time urging by the Monitor, J.A. 523, the District Court and Plaintiffs-Intervenors to do so, J.A. 717, on the basis that "the inconvenience of the Randall's Island training facility is more likely to be a hardship for Black candidates [because, as is evident] from the City's own documents[,] Black candidates…were more likely than [W]hites to" have dependents, and have less education and therefore be more likely to have inflexible, lower-paying jobs, all of which makes it harder for them to miss work for CPAT training, J.A. 438.

Further, because the City made the change without notice to the Parties and the Monitor, it lost an opportunity to plan for and achieve success by discussing with the Parties and the Monitor the potential implications of the change on Black and Hispanic attrition rates at this critical stage, namely, "reduc[ing] the time that many candidates in lower positions on this list have to prepare for the CPAT"; and increasing the need for engagement efforts during an "extended period of time (in

some cases years) before [candidates] enter the further stages of processing," and lengthening the time that they must maintain their fitness levels between the CPAT and the Medical Exam which "includes a component (the stairmill) that requires substantial physical exertion." J.A. 332, 409, 448-49. Nor could the parties discuss what additional staffing or supports would be necessary to successfully support so many more candidates at this critical stage of hiring. J.A. 400. For Exam 7001, as of the end of 2019, the percentage of voluntary attrition among Black candidates at the CPAT was 34.4%, as compared to 30.6% for Whites, and the CPAT failure rate for Black candidates was 13.5% as compared to 7.9% for Whites. J.A. 516. This was an increase in the "disparities between [B]lack and [W]hite candidates and between Hispanic and [W]hite candidates" from Exam 2000 to Exam 7001, J.A. 400, J.A. 516, and an acceleration of the rates of both voluntary attrition and disqualification for Black Candidates as compared to Exam 2000, according to City data, J.A. 439.

D. Procedural Background and Order Finding the City Violated the Modified Remedial Order

At an October 3, 2019 Status Conference, the Plaintiffs-Intervenors raised questions about what appeared to be an acceleration in CPAT processing by the City. J.A. 403. The District Court directed the Monitor to provide a report of "Defendant the City of New York's acceleration of CPAT testing." ("CPAT Acceleration Report") J.A. 186. The Monitor requested written submissions from the Parties, reviewed the correspondence and the record in the case, and filed the CPAT

Acceleration Report with the District Court on November 20, 2019. J.A. 398-415. The City, Plaintiffs-Intervenors and the United States filed written responses to the CPAT Acceleration Report in December 2019. J.A. 417-445. The Monitor filed a response on January 17, 2020. J.A. 447-55. On January 27, 2020 the District Court held a status conference. J.A. 457-98. The United States asked the Court to "find the City has violated paragraph 16 in the [MRO and] impose an appropriate remedy, which may simply be the finding itself, that the order was violated; and…focus on…attrition mitigation measures." J.A. 478. Plaintiffs-Intervenors agreed and requested both targeted relief for Black candidates who were impacted by the violation, and further analysis and planning before the City would be permitted to resume CPAT processing. J.A. 479-85. The District Court asked the Monitor to meet with the Parties and make a recommendation. J.A. 489. The Monitor considered further written submissions from the Parties and filed his recommendation on January 19, 2021. J.A. 713-35.

The Monitor recommended that "the Court find that the City violated Paragraph 16 of the MRO, because the City made a change to the hiring process for Exam 7001 from the process that had been used in Exam 2000, and did not obtain the Monitor's prior approval" and that the District Court order certain relief. J.A. 715. The Monitor noted that neither the United States nor Plaintiffs-Intervenors sought a finding of contempt or monetary sanctions, but rather a finding of a

violation of the MRO under the District Court's "inherent equitable power to enforce its orders, as well as under Paragraph 52 of the MRO, which specifically authorizes remedies for violation of the MRO." J.A. 719; *see also* J.A. 768 ("[T]he United States does not seek sanctions in the form of monetary awards against the City…nor does it seek the more grave finding of "contempt"). The City had argued to the Monitor that "[a] declaration of an MRO violation would do nothing more than place blame," J.A. 773, but as Plaintiffs-Intervenors argued, it was "essential that the Monitor and the Court make it clear that more is expected," J.A. 758.

The Parties filed objections to the Recommendation. J.A. 873-920. On June 9, 2021, the District Court issued its Order, finding that the City had violated Paragraph 16 of the MRO when it "doubled the number of candidates that it called for CPAT testing at a time and as a result, candidates took the exam more quickly, then waited longer after the exam for further processing…without approval of the Monitor." Sp. App. 8. Further, the District Court found that "the City failed to make any attempt to comply with the unambiguous command of the MRO because it never sought any form of pre-approval from the Monitor." Sp. App. 10.

The Court also ordered certain non-monetary remedial measures, Sp. App. 12-14, including directing the City to produce a

> summary of the firefighter hiring process that enumerates each step of the hiring process, specifies when during the hiring process each of the enumerated steps of the hiring process described in Paragraph 11 of the MRO takes place, the key decisions that go into executing each step,

9

and which unit of the FDNY has primary responsibility for each of the listed steps… so that it is clear under what circumstances the City is required to seek the Monitor's pre-approval and to avoid another dispute like this one.

Sp. App. 15-16.

In the instant appeal, the City challenges the finding of a violation, but does not challenge, and even agrees that it willingly submits to, the remedial measures imposed by the District Court. Br. 17.

## ISSUES FOR REVIEW

1. Did the District Court act within its discretion in finding that its own Modified Remedial Order unambiguously required the City to obtain advance approval before doubling the number of candidates it called for CPAT testing?

2. Did the District Court act within its discretion in finding that the City did not make a reasonably diligent attempt to comply with the MRO when it did not seek Monitor approval before significantly changing the entry-level firefighter hiring process?

## SUMMARY OF ARGUMENT

This Court lacks jurisdiction over the City's appeal because the City has not identified any hardship sufficient to bring the Order appealed from within the narrow

10

class of orders subject to interlocutory appeal under the collateral order doctrine. In any event, there is no ground for disturbing the conclusions of the District Court. This Court reviews the District Court's finding that the City violated Paragraph 16 of the MRO for an abuse of the District Court's broad discretion and basic authority to enforce its own orders in the context of remedying longstanding discrimination, not the more rigorous level of review applicable to contempt orders.

Under this Court's decision in *King v. Allied Vision, Ltd.*, a violation of a court order (in that case, rising to the level of contempt) occurs when "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." 65 F.3d 1051, 1058 (2d Cir. 1995). Under the first prong, the District Court correctly found that Paragraph 16 of the MRO clearly and unambiguously prohibited the City from changing the hiring process without pre-approval from the Monitor because the MRO enjoins the City from taking "any step in any process for the selection of entry-level firefighters…without first obtaining the approval of the Court Monitor." J.A. 246.

The City does not challenge the Court's finding that the proof of the City's "noncompliance was clear and convincing" under the second *King* factor.

The third prong of *King* asks whether a party was diligently attempting to comply when it nonetheless violated a court order. The correct measure of the City's

11

diligence is its efforts to comply with Paragraph 16 of the MRO with respect to the change in CPAT processing, and the District Court was correct to focus its analysis on whether the City diligently attempted to avoid its violation, not whether the City was more or less compliant at other times or with other parts of the MRO. The District Court correctly found that the City did not attempt to seek approval from the Monitor before it acted, and the City does not challenge this finding.

The City's breach was so significant and its potential effects so broad that even looking at the City's conduct as a whole, the City cannot be said to have diligently attempted to comply with the MRO. The CPAT's outsized importance in terms of attrition, and disparate outcomes, makes it a central focus of the ongoing remedial phase of this litigation and the City plainly failed to seek approval before making a major change to it. The violation also undermined the ability of many candidates to benefit from the Parties' work to analyze attrition in prior rounds of hiring and implement additional supports at this critical stage for the Black and Hispanic candidates who need them the most.

## STANDARD OF REVIEW

Appellants bear the burden of demonstrating that appellate jurisdiction exists. *See United States v. Victoria-21*, 3 F.3d 571, 575–76 (2d Cir. 1993).

The District Court correctly found that the City violated the MRO when it doubled the number of firefighter candidates it called to take the CPAT, without

12

seeking pre-approval from the Monitor. The District Court's "authority to compel compliance with its orders" is "even more basic [than its] power to hold a party in contempt," *Berger v. Heckler*, 771 F.2d 1556, 1569 n.19 (2d Cir. 1985), and securing such compliance is "an equitable goal which a court is empowered to pursue even absent a finding of contempt." *Id.* at 1569. Further, "[w]hen a district court's order is necessary to remedy past discrimination, the court has an additional basis for the exercise of broad equitable powers." *Spallone v. U.S.*, 493 U.S. 265, 276 (1990) (internal citation omitted). This Court reviews the District Court's exercise of its equitable powers for abuse of discretion, *see Sierra Club v. U.S. Army Corps. Of Engineers*, 776 F.2d 383, 390 (2d Cir. 1985), and because "[i]t is peculiarly within the province of the district court to determine the meaning of its own order, the court's interpretation of its order will not be disturbed absent a clear abuse of discretion," *Truskoski v. ESPN, Inc.*, 60 F.3d 74, 77 (2d Cir. 1995) (internal quotations and citations omitted).

The Court should reject the City's request for the "more rigorous" version of abuse of discretion review applicable to a contempt order, Br. at 18, where here, the District Court did not find (and the Parties did not seek a finding that) the City's violation amounted to contempt. *See Next Investments, LLC. v. Bank of China*, 12 F. 4th 119, 129, n.5 (2d Cir. 2021) (determining, when reviewing denial of contempt motion, that "such scrutiny is not appropriate…because the district court did not hold

13

a party in contempt"). The City does not cite, and the Vulcan Society could not find, authority in this Circuit for reviewing a finding of a violation without a finding of contempt under any higher standard than abuse of discretion. Indeed, this Court has previously expressed its disapproval of the Seventh Circuit's willingness to review a district court's "supplementary remedy to compel compliance without making a finding of contempt…as if it were a sanction imposed on an order of contempt," choosing to "rest [its] analysis instead on the district court's…basic authority to compel compliance with its orders." *Berger*, 771 F.2d at 1569, n.19.[1]

In the present case, the remedy issued by the Court to address the MRO violation consisted of non-monetary ameliorative measures to lessen the impact of the violation and to "avoid another dispute like this one." Sp. App. 13. The District Court did not award punitive or deterrent sanctions, as it might have to remedy contempt. The District Court's well-balanced determination was similar to that in *Class v. Norton*, where the court declined to find the defendant in contempt, but, having nonetheless found a violation, stated that "continued non-compliance cannot and will not be tolerated" and ordered the defendants "to take [specified] steps to properly implement [its] prior orders." 376 F. Supp. 496, 501 (D. Conn. 1974), *aff'd in part and rev'd in part on other grounds*, 505 F.2d 123 (2d Cir. 1974). Notably,

---

[1] *Cf. E.E.O.C. v. N.Y. Times Co.*, 196 F.3d 72, 81 (2d. Cir. 1999) (crediting opposite authority from other circuits, but for the proposition that the *King* factors apply, not for the purpose of determining the applicable standard of review).

the City conceded even before the District Court issued its finding that "[a] declaration of an MRO violation would do nothing more than place blame," J.A. 773, and it does not challenge any of the remedies granted in the Order as punitive, excessive, or even remotely burdensome. *See* Br. at 17 ("Indeed, the City had initiated similar measures of its own accord after consultation with the parties even before the dispute was adjudicated"). The Court should review the Order for abuse of discretion and reject the City's argument that it should apply a heightened abuse of discretion standard.

## ARGUMENT

## I.    THIS COURT LACKS APPELLATE JURISDICTION.

The final judgment rule expresses a strong preference for avoiding piecemeal review by appellate courts. This Court lacks jurisdiction to hear this appeal, because the Order below is neither a final judgment, nor part of the "small class" of interlocutory orders that can be appealed as of right while litigation below is still pending. *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546 (1949); *see also Will v. Hallock*, 546 U.S. 345, 350 (2006) ("We have meant what we have said[:] we have … kept [the 'small class'] narrow and selective in its membership."). An appealable interlocutory order under this exception must meet three requirements, cumulatively: it must be conclusive; it must resolve important

questions separate from the merits; and—most importantly here—it must be effectively unreviewable on appeal from a final judgment in the underlying action. *See, e.g.*, *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 107-08 (2009) (dismissing appeal where appellants "satisfied the first two conditions of the collateral order doctrine—conclusiveness and separateness—but not the third— effective unreviewability"); *Swint v. Chambers County Comm'n*, 514 U.S. 35, 35-36 (1995) (vacating circuit court's judgment on appeal where district court's order was neither conclusive nor unreviewable). Where an interlocutory order does not impose a hardship, there is no ground for exercising jurisdiction over an appeal from it. *See Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374–75 (1981) (doctrine has been given "a 'practical rather than a technical construction,'" permitting a "narrow exception" for review of only those interlocutory decisions that are "too important to be denied review.") (quoting *Cohen*, 337 U.S. at 546); *Mohawk*, 558 U.S. at 107 ("[t]hat a ruling 'may burden litigants in ways that are only imperfectly reparable by appellate reversal of a final district court judgment … has never sufficed'" to show that an order is effectively unreviewable).

Thus, ordinarily, "a party may not appeal a civil contempt adjudication in a pending case." Wright, Miller & Cooper, 16 Fed. Prac. & Proc. § 3917; *see also Int'l Bus. Machines Corp. v. United States*, 493 F.2d 112, 114-15 (2d Cir. 1973) (citing cases). This Court has drawn exceptions to the general rule occasionally in cases

16

involving denials of civil contempt orders seeking *coercive* sanctions where the only thing "pending" in the case was the contempt motion itself, *see, e.g.*, *Latino Officers Ass'n City of New York, Inc. v. City of New York*, 558 F.3d 159, 163 (2d Cir. 2009) (hearing appeal where plaintiffs had unsuccessfully requested, "'after the conclusion of the principal action,'"[2] contempt order finding City had continued to allow discrimination in violation of settlement agreement), or where the denial itself threatened irreparable harm, *see, e.g.*, *New York State Urban Dev. Corp. v. VSL Corp.*, 738 F.2d 61, 64-65 (2d Cir. 1984) (reviewing denial of a contempt order against insurer that arose out of earlier order mandating that the insurer provide representation of appellant in proceedings below). In other cases, this Court has found appellate jurisdiction over civil contempt orders that *were* highly coercive (including several cases involving penalties that accumulated with time). *See, e.g.*, *United States v. O'Rourke*, 943 F.2d 180, 185-86 (2d Cir. 1991) (million-dollar fine for civil contempt); *New York v. Shore Realty Corp.*, 763 F.2d 49, 51 (2d Cir. 1985) (allowing appeal where contempt sanction included $1000-per-day fine); *Vincent v.*

---

[2]     The district court had maintained jurisdiction *solely* to hear the contempt motion, not as part of an ongoing remedial phase, *see* Stipulation and Order, *Latino Officers Ass'n City of New York, Inc. v. City of New York*, Case No. 99 Civ. 6558(LAK), Dkt. No. 256 (S.D.N.Y. Jan. 5, 2007); therefore the proceedings below were terminated by the denial of the contempt order (in the same manner as a final judgment ordinarily terminates a case), and hearing the appeal from the order denying contempt did not implicate any concerns about encouraging piecemeal appeals, or interfering with the orderly conduct of extended remedial phases.

17

*Local 294, Int'l Bhd. of Teamsters*, 424 F.2d 124, 127 (2d Cir. 1970) (daily, accumulating non-compliance fines). The common thread in all these cases exercising appellate jurisdiction is that the contempt order in question (or its denial) threatened to cause significant harm to the appellants, harm that was either irreparable or "too important to be denied review"[3] immediately. That is self-evidently not the case here.

The District Court's Order does not fall within this "small class" of interlocutory orders threatening significant, non-speculative harm to appellants.[4] The briefing in this case contains much discussion as to whether or not Judge

---

[3]     *Firestone*, 449 U.S. at 374 (quoting *Cohen*, 337 U.S. at 546). A challenge to the impartiality of the district judge—as was made in *United States v. Yonkers Bd. Of Educ.*, 946 F.2d 180, 183 (2d Cir. 1991) (per curiam), the only authority the City cites in favor of appellate jurisdiction here—would presumptively qualify, although the appropriate vehicle for appellate review might be a petition for mandamus rather than a direct appeal pursuant to 28 U.S.C. § 1291.

[4]     The only jurisdictional provision the City has expressly invoked here is 28 U.S.C. § 1291, permitting appeal from "all final decisions of the district courts." *See* Br. at 3. However, substantively identical standards apply where review is sought under 28 U.S.C. § 1292(a)(1) of expressly interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions." The caselaw is clear that this provision is to be construed *very* narrowly: "Jurisdiction under section 1292(a)(1) is "available *only* in circumstances where an appeal will further the statutory purpose of permit[ting] litigants to effectually challenge interlocutory orders of *serious, perhaps irreparable, consequence*." *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981) (emphasis added) (internal citation and quotation omitted); *see also Gardner v. Westinghouse Broad. Co*., 437 U.S. 478, 480 (1978) (order at issue "did not have any such 'irreparable' effect"). If, as here, a party can appeal an interlocutory order after final judgment without suffering irreparable harm, then appellate jurisdiction will not lie under section 1292(a)(1).

Garaufis' Order constitutes a "contempt" order. *See, e.g.*, Br. 18-21, 26, 32; *supra*, pp. 13-15, 22-23. Even if the underlying Order had been a contempt order, which it was not, it is neither punitive nor burdensome in substance; the City does not seek reversal of the "sanction" in substance before this Court and is voluntarily complying with the order. Br. at 17 ("Indeed, the City had initiated similar measures of its own accord after consultation with the parties even before the dispute was adjudicated"). Instead, the City's main objection to the Order appears to be its speculative concern that the District Court may—in a separate, future decision—extend the monitorship, using the finding that a violation of the original injunction occurred to support the extension. Br. at 17, 26.[5] However, the City could equally well challenge the Order on an appeal from any such future order extending the monitorship; there is no *present* harm posed by the Order. *Cf. Int'l Silver Co. v. Oneida Cmty.*, 93 F.2d 437, 440–41 (2d Cir. 1937) (Augustus Hand, J.) (contempt order was unappealable where it did not impose a fine and "did no more than interpret the prior injunction and … direct proceedings by way of a reference which might ultimately result in some direction to pay damages"). Absent any harm that is effectively unreviewable at a later stage, there is no jurisdiction to hear the City's appeal.

---

[5] The City also claims stigmatic injury, Br. at 17 (Judge Garaufis' Order "impugns the City's record of compliance"), but this type of (putative) injury can hardly support appellate jurisdiction on the standards of injury described above.

## II. THE DISTRICT COURT CORRECTLY FOUND THAT ITS OWN MODIFIED REMEDIAL ORDER CLEARLY AND UNAMBIGUOUSLY REQUIRED THE CITY TO OBTAIN ADVANCE APPROVAL BEFORE DOUBLING THE NUMBER OF CANDIDATES IT CALLED FOR CPAT TESTING AT ONE TIME.

The District Court correctly determined that Paragraph 16 of its own MRO clearly and unambiguously prohibited the City from doubling the number of entry-level firefighter candidates it called for CPAT testing at one time, without first seeking and obtaining approval from the Monitor for the change. Under the *King* test for a finding of a violation of a court order, the first inquiry is whether the condemned conduct was clearly and unambiguously prohibited by the order. *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995). A clear and unambiguous order need not spell out every possible action that might one day violate it. For example, in *S. New England Tele. Co. v. Global NAPs Inc.*, this Court agreed with the district court that an order to disclose "any and all … property" and allow such property to be attached, clearly and unambiguously prohibited the defendant from later substituting other property for the disclosed property. 624 F.3d 123, 145 (2d. Cir. 2010). Likewise, in *United States v. N.Y.C. Dist. Council of N.Y.C.*, this Court found that a consent decree explicitly requiring the defendant union to make certain rules part of its by-laws, and to "give written notice to the Government … of any proposed changes to the By-Laws" also clearly and unambiguously, though implicitly, prohibited the union from contracting around those rules in a collective

20

bargaining agreement, without notice to the government. 229 F. App'x 14, 19, 2007 WL 1157143, at *4 (2d Cir. 2007) (Summary Order). These cases make clear that a court issuing an injunction need not set forth in detail every possible way a creative or clumsy defendant might find to violate it, in order for it to clearly and unambiguously prohibit that infinite range of behaviors.

Paragraph 16 of the MRO is broad. It prohibits the City from taking "*any* step in *any* process for the selection of entry-level firefighters, or us[ing] any examination as part of such process, without first obtaining the approval of the Court Monitor." J.A. 246, ¶16) (emphasis added). The MRO provides a definition with a non-exhaustive list of examples of such steps, including "assessing an entry-level firefighter candidate's physical fitness or ability." J.A. 244, ¶11. The District Court correctly found that "any step in any process for the selection of entry-level firefighters, or use [of] any examination as part of such process … including … assessing an entry-level firefighter candidate's physical fitness or ability" clearly and unambiguously included "any decision to alter the process by which the City calls candidates for CPAT testing[,]… an important step in the hiring process, aimed at assessing an entry-level firefighter candidate's physical fitness or ability." Sp. App. 6.

The City concedes that starting a round of CPAT testing was a "step" in the process subject to Monitor approval under Paragraph 16 of the MRO, Br. at 23, but it

21

paradoxically denies that it had any obligation to alert the Monitor to its plan to double the number of candidates tested at one time, which would, in turn, decrease the amount of time and level of support available to a large group of candidates for training prior to taking the CPAT, and increase the amount of time these candidates would have to wait and maintain their fitness levels until eventually being seated in an Academy class. Such an interpretation is like the ones sought by the defendants in *N.Y.C. Dist. Council of N.Y.C.* and *S. New England Tele. Co.* to excuse the changes they each made. Accepting it would render Paragraph 16 of the MRO meaningless. The Order's remedial measure requiring the City to produce a document setting forth an exhaustive list of hiring steps is not proof that the MRO is unclear, but rather was a necessity in the face of the City's illogical insistence that although it understood that inviting candidates to take the CPAT was a "step" toward hiring firefighter candidates into the fire Academy that required approval, it had not understood that inviting double the number of candidates to take the CPAT at one time, to fill not one, but multiple Academy classes, would also require approval. The remedy was explicitly tailored to "avoid another dispute like this one," Sp. App. 12, where the District Court, the Monitor, the United States and the Plaintiffs-Intervenors all understood plainly what was prohibited, but the City clung to its own unreasonable interpretation.[6]

---

[6] The additional requirement applicable in contempt cases that it must have been clear to the contemnor "at the time of the alleged conduct" that it would violate the

[Continued on Next Page]

22

## III.   THE DISTRICT COURT CORRECTLY FOUND THAT THE CITY DID NOT DILIGENTLY ATTEMPT TO COMPLY WITH THE MRO WHEN IT DID NOT SEEK MONITOR PRE-APPROVAL BEFORE DOUBLING THE NUMBER OF CANDIDATES IT CALLED FOR CPAT TESTING AT ONE TIME.

A. <u>The District Court Correctly Found That The City Did Not Diligently Attempt To Comply With The MRO With Respect To The Change in CPAT Processing.</u>

The District Court correctly found that the City did not diligently attempt to comply with the MRO because it did not seek to obtain Monitor approval before changing who it called to take the CPAT and when. The third prong of *King* asks whether a party was diligently attempting to comply when it nonetheless violated a court order. 65 F.3d 1051, 1058 (2d Cir. 1995). The correct measure of the City's diligence is its efforts to comply with Paragraph 16 of the MRO with respect to the change in CPAT processing. *See Latino Officers Ass'n City of N.Y. v. City of N.Y.*, 519 F. Supp. 2d 438, 443 (S.D.N.Y. 2007) (noting, without reaching the third prong of *King*, that because the court order alleged to have been violated "incorporated all the terms of" an agreement, "noncompliance with any of the terms of the Agreement could constitute a violation of" the order); *see also Utica College v. Gordon*, 389 F.

_____

order, such "that it would not be unreasonable to require compliance in the first instance on pain of contempt," *Next Invs., LLC v. Bank of China*, 12 F.4th 119, 131 (2d Cir. 2021), does not excuse an unreasonable misinterpretation of a clear and unambiguous order. In any case, the City's brief conveniently excludes the portion of the quote that limited this requirement to contempt cases, which this case is not. Br. at 21.

23

App'x. 71, 73, 2010 WL 3157169, at \*2 (2d. Cir. 2010) (Summary Order) (defendant's diligence in attempting to comply with one part of an order (returning documents) did not erase his violation of a "separate prohibition" (obtaining and using copies thereof)); *N.Y.C. Dist. Council of N.Y.C*, 229 F. App'x at 19, 2007 WL 1157143, at \*4 (Summary Order) (the "Union did not diligently attempt to comply with the Decree…[because] the Union made no attempt to notify it, either before or after it entered into the[] CBAs, that these changes would occur").

The City declares that the correct measure of its diligence is its "compliance with the order as a whole." Br. at 26-27. But a "general compliance" or "substantial compliance" standard for diligence would render a comprehensive, multi-part order about a complex process less enforceable than an order enjoining a single course of conduct. Further, an *attempt* is only meaningful as a consideration in the context of mitigating a *failure*. Thus, *Perez v. Danbury Hosp.*, where this Court found that the defendant did not just diligently attempt to comply, but did, in fact, comply, does not set a standard for the kind of diligence that saves a breaching party from a finding of a violation of a clear and unambiguous order. *See* 347 F.3d 419 (2d. Cir. 2003).[7] The City's reliance on *Juan F v. Weicker* is also misplaced; that case says only that "Defendants' argument of substantial compliance might become relevant if ever

---

[7] The City does not provide any other example of a case where this Court found that a violation was saved by a diligent attempt to comply.

24

there should be a hearing for contempt based on claimed noncompliance by defendants," 37 F.3d 874, 879 (2d Cir. 1994), but it is far from clear from that speculative dictum that the concept of substantial compliance would be relevant under the third *King* factor as opposed to the second. While it may be reasonable to consider overall compliance as an indication of good faith and thus a mitigating factor when there has also been some effort to avoid the particular violation alleged, it simply cannot be true that a significant but singular violation is no violation at all. Thus, the District Court was correct to focus its analysis on whether the City diligently attempted to avoid its violation, not whether the City was compliant at other times or with other parts of the MRO.

The District Court found that "the City failed to make any attempt to comply with the unambiguous command of the MRO because it never sought any form of pre-approval from the Monitor," Sp. App. 10, before it changed the rate at which it processed candidates through the CPAT, thereby also affecting what anti-attrition supports would be available to those candidates and when. The City does not challenge the District Court's factfinding. Like the order in *Latino Officers Ass'n City of N.Y.*, the MRO is multifaceted; it required Monitor approval for every step in every process of entry-level firefighter hiring, each of which the record makes clear has potential inclusive and exclusive effects on Black and Hispanic hiring, and the failure to even attempt to seek approval for a change to a step is a failure to even

25

try to comply. But, the CPAT process in particular carries outsized importance because, as is undisputed and as the Monitor, J.A. 400, and District Court found, it "has long been a focus of this litigation because it is a stage at which many candidates drop out of the process, and at which improved communication and recruitment practices could pay large dividends in terms of hiring" Black and Hispanic candidates, Sp. App. 7. Yet, "the City failed to make any attempt to comply with the unambiguous command of the MRO because it never sought any form of pre-approval from the Monitor," Sp. App. 10, before it changed the rate at which it processed candidates through the CPAT, thereby also affecting what anti-attrition supports would be available to those candidates and when. The City does not challenge the District Court's factfinding, and this Court should affirm, as the City's argument regarding compliance with other provisions or at other times is not relevant under applicable law.

B. The City's Breach Was So Central To The MRO And The Purpose Of The Monitorship, That It Cannot Be Said To Have Substantially Complied With The MRO.

Even looking at the City's conduct as a whole, the City cannot be said to have diligently attempted to comply with the MRO, when it did not attempt to seek the Monitor's approval before making a major change to its policy and practice for calling candidates to take the CPAT, the single most significant stage of the hiring process for attrition. The Parties, the Monitor, and the District Court have repeatedly

26

acknowledged that the CPAT is the "largest cause of attrition … and the dominant factor in the disparity in attrition between [B]lack and [W]hite candidates," J.A. 328; *see also* 331, J.A. 517, as well as a stage with "the potential to significantly [improve] overall hiring rates for Black and Hispanic candidates," J.A. 714; *see also* J.A. 321-22, 331, 400, 402, 518. As the Monitor's experts have found, "preparation and familiarity with what to expect on the task are…significant factors," J.A. 328, and City data shows that extra preparation and communication is particularly important for Black and Hispanic candidates who are less likely to have the "benefit of friends and/or family who can share their own experience and guidance," J.A. 448, 714, with 70% of White candidates having family ties to incumbent firefighters, as compared to only 30% of Black candidates, J.A. 281, 315. Thus, the Record is replete with acknowledgment by the District Court, the Monitor, the Plaintiffs, the Plaintiff-Intervenors and the City that special care was necessary to decrease Black and Hispanic attrition at the CPAT, and the CPAT has been a focus of the Parties' efforts to reduce Black and Hispanic attrition overall. J.A. 333, 714, Sp. App. 7.

The City's breach had far-reaching implications for the whole hiring process. The City did not just double the number of candidates invited to take the CPAT but did so before agreed-upon supports were fully developed or implemented. J.A. 400, 409-410. Candidates who were rushed through the CPAT in the Summer of 2019 did not get the benefit of a convenient CPAT training location until just one month

27

prior to the September 2019 CPAT tests. J.A. 322, 403, 410, 519, 717. This was despite the City's acknowledgment to the District Judge of "the importance of attending at least seven to eight CPAT trainings," J.A. 277, and the Monitor's, the District Court's and Plaintiffs-Intervenors' long-time urging to establish a CPAT training location more convenient than Randall's Island, J.A. 523, 717, on the basis that "the inconvenience of the Randall's Island training facility is more likely to be a hardship for Black candidates [because, as is evident] from the City's own documents[,] Black candidates…were more likely than [W]hites to" have dependents, and have less education and therefore be more likely to have inflexible, lower-paying jobs, all of which makes it harder for them to miss work for CPAT training, J.A. 438. By the summer of 2019, the City had also "identified or agreed to adopt" but had not yet implemented additional supportive measures for CPAT takers, J.A. 400, including "updated and improved CPAT-focused fitness tips," J.A. 322, 335; and "the ability to leave voice messages for candidates and maintain records of robocalls," J.A. 336, 410.

The City also deprived the additional candidates it called of the benefit of improved anti-attrition measures based on an analysis of the prior CPAT round, J.A. 400, 409, 532, which the City did not deliver to the Monitor until June 18, 2019, J.A. 341, 532, shortly before CPAT practice tests began.

Further, because the City made the change without notice to the Parties and

the Monitor, it lost an opportunity to plan for and achieve success by discussing with the Parties and the Monitor the potential implications of the change on Black and Hispanic attrition rates at this critical stage, namely, "reduc[ing] the time that many candidates in lower positions on this list have to prepare for the CPAT"; and increasing the need for engagement efforts during an "extended period of time (in some cases years) before [candidates] enter the further stages of processing," and lengthening the time that they must maintain their fitness levels between the CPAT and the Medical Exam which "includes a component (the stairmill) that requires substantial physical exertion." J.A. 332, 409, 448-49.  It also extended "the amount of time Exam 7001 candidates w[ould] have to wait between passing the CPAT and getting into the Academy…from a maximum of approximately 16 months for Exam 2000 to a maximum of approximately 27 months for Exam 7001." J.A. 399. For Exam 7001, as of the end of 2019, the percentage of voluntary attrition among Black candidates at the CPAT was 34.4%, as compared to 30.6% for Whites, and the CPAT failure rate for Black candidates was 13.5% as compared to 7.9% for Whites. J.A. 516. This represents a growth in the "disparities between [B]lack and [W]hite candidates and between Hispanic and [W]hite candidates" from Exam 2000 to Exam 7001, J.A. 400, *and see* J.A. 516, and an acceleration of the rates of both voluntary attrition and disqualification for Black Candidates as compared to Exam 2000, according to City data, J.A. 439.

29

The City's violation of the Order was not an inconsequential error. It affected a large number of candidates, has far-reaching potential implications on other phases of the hiring process, and was central to the purpose of the MRO and the Parties' and Court Monitor's remedial work.

## CONCLUSION

The Court should decline to hear the appeal, or in the alternative, should affirm the District Court's Order, entered June 9, 2021, because the District Court correctly found that the MRO clearly and unambiguously prohibited the City's conduct, which the City did not attempt to avoid.

Dated:  New York, New York
      February 17, 2022             Respectfully Submitted,

                                  LEVY RATNER, P.C.

                                  */s/ Dana Lossia*

                     By:    Dana Lossia

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a) of the Federal Rules of Appellate

Procedure, the foregoing brief is in 14-point Times New Roman proportional font,

and as calculated by word processing software (Microsoft Word), contains 8,081

words, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(f).

Dated:      New York, NY
            February 17, 2022


                          LEVY RATNER, P.C.

                          */s/ Dana Lossia*_____
            By:    Dana Lossia

**CERTIFICATE OF SERVICE**

I hereby certify that on February 17, 2022, I electronically filed the foregoing Brief for Plaintiffs-Intervenors-Appellees Vulcan Society et al., with the Clerk of the Court of the U.S. Court of Appeals for the Second Circuit by using the Appellate CM/ECF system.

*/s/ Dana Lossia*
Dana Lossia