# 21-1929

## United States Court of Appeals
## for the Second Circuit

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

VULCAN SOCIETY, MARCUS HAYWOOD, CANDIDO NUNEZ,
ROGER GREGG, JAMEL NICHOLSON, RUSEBELL WILSON,
KEVIN WALKER, KEVIN SIMPKINS,

*Plaintiffs-Intervenors-Appellees,*

*against*

THE CITY OF NEW YORK,

*Defendant-Appellant,*

NEW YORK CITY FIRE DEPARTMENT, NEW YORK CITY
DEPARTMENT OF CITYWIDE ADMINISTRATIVE SERVICES,
MAYOR MICHAEL R. BLOOMBERG, NEW YORK FIRE
COMMISSIONER NICHOLAS SCOPPETTA,

*Defendants.*

On Appeal from the United States District Court
for the Eastern District of New York

## REPLY BRIEF

RICHARD DEARING
DEBORAH A. BRENNER
JAMISON DAVIES
  *of Counsel*

March 10, 2022

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*
*of the City of New York*
Attorney for Appellant
100 Church Street
New York, New York 10007
212-356-2490 or -0826
jdavies@law.nyc.gov

Reproduced on Recycled Paper

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES....................................................................iii

PRELIMINARY STATEMENT.......................................................... 1

ARGUMENT ................................................................................. 3

POINT I ...................................................................................... 3

    THIS COURT HAS APPELLATE JURISDICTION OVER
    THE DISTRICT COURT'S POST-JUDGMENT ORDER .............. 3

POINT II....................................................................................... 9

    APPELLEES' EFFORTS TO DEFEND THE DISTRICT
    COURT'S ORDER ARE UNAVAILING ......................................... 9

    A.  Under the stringent standard of *King*'s first prong, the
        four corners of the MRO did not provide clear notice that
        Monitor approval was required here........................................ 10

        1. Appellees cannot refute the conclusion that the MRO
           on its face is too ambiguous to satisfy *King*......................... 11

        2. Appellees' efforts to extend the MRO to the City's
           conduct by inference, suggestion, and analogy cannot
           be reconciled with *King*........................................................ 14

    B.  Under *King*'s third prong, the City diligently attempted
        to comply with the MRO........................................................ 21

        1. Appellees offer no principled reason to disregard the
           City's years of diligent compliance with the MRO. ............. 22

        2. Even limited to the context of this dispute, the City's
           attempts to comply were diligent. ...................................... 26

i

## TABLE OF CONTENTS (cont'd)

**Page**

CONCLUSION ........................................................................ 29

CERTIFICATE OF COMPLIANCE ....................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Armstrong v. Schwarzenegger,*
  622 F.3d 1058 (9th Cir. 2010) ................................................................. 4

*Autotech Techs. LP v. Integral Research & Dev. Corp.,*
  499 F.3d 737 (7th Cir. 2007) ............................................................. 3, 5

*Berger v. Heckler,*
  771 F.2d 1556 (2d Cir. 1985) ............................................................. 10

*Chao v. Gotham Registry, Inc.,*
  514 F.3d 280 (2d Cir. 2008) ............................................................... 10

*Gucci Am. v. Bank of China,*
  768 F.3d 122 (2d Cir. 2014) ............................................................... 11

*Juan F. v. Weicker,*
  37 F.3d 874 (2d Cir. 1994) ................................................................. 22

*King v. Allied Vision, Ltd.,*
  65 F.3d 1051 (2d Cir. 1995) ...................................................... *passim*

*Latino Officers Ass'n City of N.Y. v. City of New York,*
  558 F.3d 159 (2d Cir. 2009) ................................................................. 7

*Missouri v. Jenkins,*
  515 U.S. 70 (1995) ..................................................................... 23, 24

*New York v. Shore Realty Corp.,*
  763 F.2d 49 (2d Cir. 1985) ............................................................. 7, 8

*Next Invs., LLC v. Bank of China,*
  12 F.4th 119 (2d Cir. 2021) ............................................................... 11

*Powell v. Ward,*
  643 F.2d 924 (2d Cir. 1981) ............................................................... 27

iii

# TABLE OF AUTHORITIES (cont'd)

**Page(s)**

*Silverman v. Tracar, S.A.*,
  255 F.3d 87 (2d Cir. 2001) ........................................................ 3, 4, 5, 8

*Southern New England Telephone Co. v. Global NAPs Inc.*,
  624 F.3d 123 (2d Cir. 2010) ........................................................ 18, 19

*Terebesi v. Torreso*,
  764 F.3d 217 (2d Cir. 2014) ................................................................ 6

*United Mine Workers v. Bagwell*,
  512 U.S. 821 (1994) .................................................................... 23, 24

*United States v. City of New York*,
  717 F.3d 72 (2d Cir. 2013) .......................................................... 21, 26

*United States v. Int'l Bhd. of Teamsters*,
  931 F.2d 177 (2d Cir. 1991) ................................................................ 4

*United States v. O'Rourke*,
  943 F.2d 180 (2d Cir. 1991) ................................................................ 8

*United States v. Stewart*,
  452 F.3d 266 (3d Cir. 2006) ................................................................ 3

*Vincent v. Local 294, Int'l Bhd. of Teamsters*,
  424 F.2d 124 (2d Cir. 1970) ............................................................ 7, 8

*Yurman Studio, Inc. v. Castaneda*,
  2009 U.S. Dist. LEXIS 13870 (S.D.N.Y. Feb. 23, 2009) .............. 22, 23

**Statutes**

28 U.S.C. § 1291 .......................................................................... 3, 7

## TABLE OF AUTHORITIES (cont'd)

**Page(s)**

**Other Authorities**

N.Y.C. Dep't of Citywide Administrative Services, *Notice of Examination No. 7001* ...................................................................17

U.S. Dep't of Justice, *Review of the Use of Monitors in Civil Settlement Agreements and Consent Decrees involving State and Local Governmental Entities* (Aug. 13, 2021)....................23

## PRELIMINARY STATEMENT

As the City's opening brief established, the district court made two errors, each of which independently requires reversal. First, the court erred in finding that the modified remedial order (MRO) unambiguously required the City to obtain the Monitor's approval before deciding how many CPAT notices to send at once. Nothing in the order's text clearly required approval for this granular piece of the FDNY's hiring process. Second, while recognizing the City's eight-year history of compliance, the court erroneously concluded that one good-faith mistake amounted to a lack of diligence sufficient to support a contempt finding.

Neither appellee offers a convincing case for affirmance. First, though the cornerstone of this Court's test is absolute clarity in the four corners of the order, appellees point to nothing in the MRO's text unambiguously informing the City that additional approval was required here. Instead, they rely on suggestion, analogy, and extrinsic facts. None of that would be necessary if the text gave clear notice of precisely what is and isn't required, which is the beginning and end of the analysis.

Likewise, this Court should reject appellees' defense of the district court's conclusion that the City's efforts fell short of reasonable diligence.

In the context of any far-reaching remedial order, diligence should be measured by the party's overall course of conduct. Neither appellee offers a convincing reason for this Court to ignore the complexities of implementing institutional reforms via court order and adopt the unyielding metric applied when a party disobeys a straightforward and specific command. That aside, there is no doubt that the City acted in good faith, and that any failing was the result of a reasonably mistaken belief about what the order required—and, at worst, internal confusion over the FDNY's past practices in the wake of a staff overhaul.

Long-term monitorships impose steep financial and administrative costs on localities and impede their self-governance. As the United States recently acknowledged, best practices demand periodic scrutiny to guard against, among other things, high costs with diminishing returns (*infra* 23). Yet the appellees here have telegraphed their intent to leverage the mistaken order now on appeal to extend the monitorship, despite the City's clear progress toward eradicating vestiges of past discrimination— and despite the eventual goal of all such remedial orders, which is returning to the locality the power to reform and monitor itself. The order should not stand.

2

## ARGUMENT

## POINT I

## THIS COURT HAS APPELLATE JURISDICTION OVER THE DISTRICT COURT'S POST-JUDGMENT ORDER

To begin, this Court should reject any challenge to its jurisdiction to hear this appeal, which is taken from a post-judgment ruling on a substantive motion treated as final under § 1291. Though both appellees raise this issue, only the Vulcan Society mounts more than a nominal challenge (*compare* Brief for the United States ("U.S. Br.") 3 *with* Brief for Intervenors-Appellees ("Vulcan Br.") 15–19).

Orders entered post-judgment are "generally appealable unless they are ministerial or administrative, such as post-judgment discovery orders." *Silverman v. Tracar, S.A.*, 255 F.3d 87, 92–93 (2d Cir. 2001) (cleaned up)[1]; *see also, e.g.*, *United States v. Stewart,* 452 F.3d 266, 272 (3d Cir. 2006) ("most post judgment orders are final decisions within the ambit of 28 U.S.C. § 1291" (cleaned up)); *Autotech Techs. LP v. Integral Research & Dev. Corp.,* 499 F.3d 737, 745 (7th Cir. 2007) (same). Here,

---

[1] This brief uses "(cleaned up)" to indicate that internal quotation marks, alterations, and citations have been omitted from quotations.

3

the MRO is a judgment and permanent injunction entered after an extensive bench trial (Joint Appendix ("A") 240); and the district court's order finding a violation of the MRO, which is tantamount to contempt of court, falls within the class of appealable post-judgment orders.

The rule permitting appeals of substantive post-judgment orders is particularly salient for cases that, as here, "involv[e] a protracted remedial phase." *Silverman*, 255 F.3d at 93 (cleaned up). In the Court's framing, substantive post-judgment orders in such cases are "readily …. appealable." *Id.* This sensible rule recognizes that implementation of ongoing remedies "gives rise to issues of appellate review that differ from those in ordinary litigation." *United States v. Int'l Bhd. of Teamsters*, 931 F.2d 177, 183 (2d Cir. 1991).

As is often the case after issuance of a remedial order, this appeal "concern[s] implementation of the judgment itself" and "may be unreviewable if appeals are delayed until compliance is final." *Id.*; *see also Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1064 (9th Cir. 2010) (explaining that "appeals courts have jurisdiction over post-judgment orders" including orders entered "to enforce a prior order"). If the City is not permitted to appeal the district court's order now, and the district

4

court later declines to dissolve the monitorship based in whole or in part on the found violation, the City may have lost its only chance to challenge the finding. *See Silverman*, 255 F.3d at 93–94 (unappealed post-judgment orders "have preclusive effect against parties who could have but did not appeal them"). A different rule would create an unacceptable risk that "all opportunity for review will be lost." 15B Charles Alan Wright, *et al.*, Fed. Prac. & Proc. § 3916.

Thus, as explained by the same treatise that both appellees invoke (U.S. Br. 2; Vulcan Br. 16), in institutional reform litigation a "court determined to reform a complex social institution may be compelled to retain jurisdiction for many years," which has already occurred here. The court may then enter any number of "orders after the initial determination that reform is required." Wright, Fed. Prac. & Proc. § 3916. So long as those orders "finally dispose[] of the question" raised in the underlying motion—here, whether the City violated a clear mandate in the MRO—final judgment appeal is available. *Id.*; *see also Autotech,* 499 F.3d at 745.

Indeed, the Vulcan Society relies on cases showing that this Court often exercises appellate jurisdiction where the district court has passed

on a violation of an underlying remedial order or consent decree. For instance, in *Class v. Norton* (Vulcan Br. 14), this Court reviewed an order finding the appellant in violation of a prior order without a whisper of any jurisdictional defect. 505 F.2d 123, 124–28 (2d Cir. 1974).[2] Likewise, in *EEOC v. New York Times Co.* (Vulcan Br. 14), this Court considered an appeal of the district court's order finding consent decree violations, again without questioning jurisdiction. 196 F.3d 72, 82 (2d Cir. 1999). While the appellants in that case, unlike here, challenged the prospective relief ordered as well as the finding of a violation, nothing in the opinion suggests that the scope of the challenge affected this Court's jurisdiction. *Id.*; *see also Class*, 505 F.2d at 125 (taking jurisdiction despite no challenge to prospective relief). And, if there had been any jurisdictional issue with hearing those cases, presumably this Court would have declined to hear them. *See Terebesi v. Torreso*, 764 F.3d 217, 228 n.9 (2d Cir. 2014) (this Court has the "independent obligation to consider the presence or absence of appellate jurisdiction" (cleaned up)).

---

[2] In *Class*, the appellant also challenged a fee award and the district court's "reaffirmation" of its previous unappealed order, but, like the City here, accepted the prospective relief ordered by the district court. 505 F.2d at 125. Though this Court held that the substantive challenge to the order was barred, that ruling was based on res judicata and not any jurisdictional defect. *Id.*

Because the basis for this court's jurisdiction is that substantive post-judgment orders constitute "final decisions" within the scope of § 1291, the Vulcan Society's discussion of the appealability of contempt orders issued on the way to final judgment misses the mark entirely (Vulcan Br. 16). Indeed, while pre-judgment contempt orders are, as Vulcan points out, generally unappealable before a final judgment, post-judgment contempt orders are generally appealable just like all other post-judgment orders. *See Latino Officers Ass'n City of N.Y. v. City of New York*, 558 F.3d 159, 163 (2d Cir. 2009); *New York v. Shore Realty Corp.*, 763 F.2d 49, 51 (2d Cir. 1985); *Vincent v. Local 294, Int'l Bhd. of Teamsters*, 424 F.2d 124, 128 (2d Cir. 1970).

The Vulcan Society also contends that the City could challenge the current order on a hypothetical appeal from a future order extending the monitorship, reaching back to relitigate this order in the course of litigating a potential future appeal (Vulcan Br. 19). Actually, no order is needed to extend the MRO; it exists until the district court dissolves it (A264–65). More importantly, on the Vulcan Society's theory of finality, an order declining to dissolve the MRO would also be unappealable because the remedial phase would continue. And the City would be bound

7

by the district court's ruling if it were to wait until the that court issues a hypothetical future "judgment." *See Silverman*, 255 F.3d at 93–94.

The Vulcan Society further posits that appealability turns on whether contempt orders are sufficiently "coercive" (Vulcan Br. 17–18). But in the cases it cites for this proposition, this Court never mentioned that appellate jurisdiction had anything to do with how "coercive" the contempt sanction was. Instead, jurisdiction was premised on the fact that each order was issued post-judgment. *See United States v. O'Rourke*, 943 F.2d 180, 186 (2d Cir. 1991) (permitting appeal of contempt proceedings "instituted after the conclusion of the principal action"); *Shore Realty*, 763 F.2d at 51 (post-judgment proceeding); *Vincent*, 424 F.2d at 128 (same).

In any case, the district court's finding imposes potentially important consequences. As noted in our opening brief (Brief for Appellants ("App. Br.") 17), the United States announced that it would use this violation to oppose the dissolution of the MRO and to "preclude[]" the City from making arguments in favor of dissolution (A767). While not necessary to confer appellate jurisdiction on this Court, the finding of a

violation has obvious potential collateral effects, and the City is entitled to appeal it.

## POINT II

### APPELLEES' EFFORTS TO DEFEND THE DISTRICT COURT'S ORDER ARE UNAVAILING

Appellees fare no better on the merits. Nothing in the MRO's text clearly required the City to obtain approval before deciding to schedule enough candidates for the CPAT to fill two Academy classes at once. Far from demonstrating any such clear requirement in the text, appellees' arguments highlight the MRO's ambiguity. And they cannot refute that the City diligently attempted to comply with the MRO, whether that inquiry is viewed in the context of the entire history of the Monitorship, as it should be, or in the more limited context of the pace of CPAT administration.

At the threshold, the Vulcan Society (but not the United States) argues that this Court should not apply the more rigorous abuse-of-discretion standard for reviewing contempt findings (*see* App. Br. 13–14) because the order was not denominated as a finding of contempt, despite application of the contempt factors by the court and all parties (Vulcan

Br. 13–15). But while the district court did not explicitly find the City in contempt, the finding that the City violated an unambiguous court order should be reviewed under the same heightened standard. *See N.Y. Times*, 196 F.3d at 80 (even though "no contempt sanctions were imposed" this Court reviews the finding of a violation of a court order "in the same manner as if the court had held appellants in contempt"); *Berger v. Heckler*, 771 F.2d 1556, 1569 n.19 (2d Cir. 1985) ("[W]here a district court has provided a supplementary remedy to compel compliance without making a finding of contempt, a reviewing court may treat the remedy as if it were a sanction imposed on an order of contempt."). In any event, under either standard of review, this Court should reverse.

### A. Under the stringent standard of *King*'s first prong, the four corners of the MRO did not provide clear notice that Monitor approval was required here.

The touchstone of *King* and its progeny is the absolute need for clarity and precision in the order alleged to have been violated. *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995). A party must be able to ascertain, from the order alone, "precisely what it can and cannot do." *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 292 (2d Cir. 2008). And the party's obligations must have been clear at the time of the alleged

10

conduct. *Next Invs., LLC v. Bank of China*, 12 F.4th 119, 131 (2d Cir. 2021). Any ambiguities or omissions in the order must be read in favor of the party charged with a violation. *Gucci Am. v. Bank of China*, 768 F.3d 122, 143 (2d Cir. 2014).

### 1. Appellees cannot refute the conclusion that the MRO on its face is too ambiguous to satisfy *King*.

Notably, neither appellee seriously defends the district court's standard for determining what constitutes a "step" in the entry-level firefighter hiring process, which turned on whether the conduct at issue is a "policy decision" with "significant effects" on hiring (SPA7). They cannot deny that the lower court thus imposed an entirely new standard found nowhere in the MRO, much less in the document's definition of a "step" in that process (A244–45). Likewise, none of the steps listed in the MRO's definition of the hiring process cited by the district court unambiguously covers the decisionmaking at issue here (*id.*). As we explained in our opening brief, on this basis alone, the district court's conclusion was fatally flawed (App. Br. 22–23).

Beyond the text of the order itself, the City pointed to additional factors to support the conclusion that the order did not unambiguously

11

cover the conduct at issue (App. Br. 24–26). Appellees' attempts to discount those supporting factors are unavailing. Their first response is that the City sought and received Monitor approval in the past for small changes to FDNY hiring practices that were not specified in the MRO (U.S. Br. 32). But such extrinsic evidence is barred by the *King* test, which limits consideration to the "four corners" of the order. *King*, 65 F.3d at 1058. In any case, the fact that the City has been so cooperative as to seek approval beyond its strict obligations is no indication that this decision violated the MRO—if anything, it confirms that the City has made exceptionally diligent efforts to comply (*see infra* 20–25).

Likewise, the United States attempts to refute the City's point that this decision is not covered by the MRO's text by pointing out that the decision was made by Assistant Commissioner Giraud, "a top FDNY official," in conjunction with "other City personnel" (U.S. Br. 32). But whether an assistant commissioner took part in decision-making has nothing to do with whether it is a step as defined by the MRO. Many of the actions defined as "steps" in the MRO would be unlikely to be taken by a "top official" or involve a significant policy decision. For example, whether to "award or not award" New York City residency credits to a

12

given candidate is not likely to involve a high-level policy decision, but it is a step as defined by the MRO (A244). Thus, nothing in the MRO— explicitly or by implication—gave notice that the decisionmaker's rank dictated whether Monitor approval was needed.

On that point, it is revealing that no one—not the district court, the Monitor, or plaintiffs—suggested that the City violated paragraph 16 of the MRO until the City indicated it would soon move to end the monitorship, even though they were all fully aware of the number of candidates that had been scheduled for each round of the CPAT (*see, e.g.*, A280, 329–31, 403; E.D.N.Y. ECF No. 1877 at 12). The United States dismisses the delay between its awareness of the pace of CPAT administration and the request for a finding of a violation because a "finding of an MRO violation" is "a remedy of last resort" and that, under the terms of the MRO, the parties had to work to resolve disputes in the first instance (U.S. Br. 33). But, while it is certainly correct that that a *finding* of a violation is a last resort, that does not mean that the parties were somehow precluded by the MRO from even *flagging* such a violation once they were aware of what they now deem a clear breach of its terms.

13

The United States also disputes the City's argument that the district court's order requiring a formalized list of all "steps" in the hiring process undermines its conclusion that the MRO was unambiguous at the time of the challenged conduct (U.S. Br. 34–36). According to the United States, the City's argument "conflates a lack of clarity about the substance of its past practice with a lack of clarity about whether a change to the practice requires approval" (U.S. Br. 35), and the remedy is intended to fix the former and not the latter. Not so. In fact, the district court spelled out its purpose plainly: "to clarify the steps in the hiring process so that it is clear under what circumstances the City is required to seek the Monitor's pre-approval" (SPA13). And that need for clarity demands reversal.

## 2. Appellees' efforts to extend the MRO to the City's conduct by inference, suggestion, and analogy cannot be reconciled with *King*.

In advancing their own construction of the MRO that would cover the City's conduct, appellees rely on inference and analogy—an implicit concession that nothing in the MRO expressly defines determining the pace of calling candidates to take the CPAT as a "step" in the process. Thus, their arguments only confirm that the order is too vague to support

14

the district court's finding. At most, appellees arrive at a *permissible* reading of the MRO, but the test for contempt requires an *unmistakable* command—a much higher standard that they do not approach.

To start, the United States can point to no provision of MRO paragraph 11, which defines the "steps" of the hiring process, that unambiguously covers the City's conduct here. The United States first argues that the CPAT is "part of a process subject to the MRO" (U.S. Br. 28). We agree (*see* App. Br. 21–22). But as there is no dispute that the City obtained the Monitor's permission to begin administering the CPAT (A790), this straw-man argument falls flat. The United States also points to other provisions of paragraph 11, none of which directly apply (U.S. Br. 28). The most the United States can say about these provisions is that they show that the "MRO reaches many steps for each assessment" (*id.*), which says nothing about whether calling enough candidates to fill two classes is clearly and unambiguously a "step."

Next, the United States argues that several of the examples in paragraph 11 reference the City's "determining" how to use an assessment, which "suggests" that the "City's policy determinations about its assessments" are subject to paragraph 16 (U.S. Br. 29). Of

15

course, to support a finding under *King*, the order cannot merely "suggest[]" that the conduct was not allowed; it must "precisely" set forth "what acts are forbidden." *King*, 65 F.3d at 1058 (cleaned up). Moreover, all the examples in paragraph 11 that use the word "determining" relate to a determination about a *particular applicant's* candidacy, not broad administrative choices like this one (*see* A244–45). Thus, the use of the word "determining" hardly supports the United States' argument that any "policy decision" is unambiguously covered by the MRO.

The United States also argues that two examples in paragraph 11 cover decisions involving the initiation of a "stage" in the hiring process (they carefully avoid using the defined term "step"), and, therefore, that the decision here is also covered (U.S. Br. 29). The two proffered examples are issuing a Notice of Examination and beginning the background check process (*id.*). Of course, neither governs anything about the CPAT process, let alone the more granular decision about the rate of scheduling

16

candidates for the test.[3] The most the United States can say, without explaining why, is that it "follows by analogy" that the "initiation of the CPAT stage of the hiring process" is a step (U.S. Br. 30).

Again, the City does not dispute that the initiation of the CPAT is a step in the hiring process, but rather only contests that determining the rate of calling candidates to take the exam is also one. Moreover, if a party must analogize to determine whether its conduct violates a court's order, then the order is insufficiently clear at the first step of the *King* test. 65 F.3d at 1058. The United States' strained arguments fall short of calling that conclusion into question.

Finally, the United States argues that two separate MRO provisions—one governing the Monitor's oversight responsibilities and another directing the City to eliminate policies that have a disparate impact—if knitted together just so, support the finding that the City

---

[3] Both of these pieces of the hiring process are far removed from the CPAT. The Notice of Examination was published before the *written* firefighter exam—administered years earlier—which produced the rank-ordered civil-service eligible list that dictates the order in which candidate bands are scheduled for the CPAT (*see* N.Y.C. Dep't of Citywide Administrative Services, *Notice of Examination No. 7001* at 3, *available at* https://perma.cc/RNH6-EL39). And FDNY background checks are performed by two FDNY bodies with no involvement in physical aptitude assessment: the Candidate Investigation Division and the Personnel Review Board (s*ee* A242, 252–54).

violated paragraph 16 (U.S. Br. 30–31). Essentially, the United States asks the Court to deduce from paragraph 31, obligating the Monitor to oversee the City's efforts to mitigate disparate candidate attrition, and paragraph 19, requiring the City to take steps necessary to eliminate policies with an unnecessary disparate impact,[4] that deciding how quickly to call CPAT candidates must be covered by paragraph 16, requiring advance approval (*id.*). Given the stringency of *King*'s first prong, this tortuous reasoning fails. While those paragraphs provide general background principles underlying the entire MRO and its goal of reducing discrimination, nothing in them sheds any light on what constitutes a step in the hiring or whether Monitor approval was required here—certainly not in a clear and unambiguous way.

For its part, the Vulcan Society argues that *King*'s clarity requirement does not obligate the order to "spell out every possible action that might one day violate it" (Vulcan Br. 20). That is true as far as it goes, but the precedent on which the Vulcan Society relies show far more clarity than was present here. In *Southern New England Telephone Co.*

---

[4] Notably, the Monitor and the district court both concluded that the City did *not* violate paragraph 19 (A728–31, SPA11–12), and neither plaintiff appealed that sound determination.

18

*v. Global NAPs Inc.*, 624 F.3d 123 (2d Cir. 2010), the order obligated a defendant to inventory specified assets and permitted the plaintiff to attach the disclosed assets to satisfy a judgment. *Id.* at 139. The defendant then attempted to swap in other assets, different from those it had disclosed, and argued that it could provide any "fungible substitutes" to the disclosed assets. *Id.* at 145. This Court rejected this attempt to read ambiguity into the order where none existed, recognizing that it could "hardly be clearer" that that the order provided the plaintiff the ability to attach the specific property that had been disclosed. *Id.* Here, by contrast, it is appellees, not the City, who want to engraft new language onto the MRO's plain text.

In fact, the order in *New England Telephone* neatly illustrates the difference between compliance with relatively straightforward judgments and complex, ongoing remedial orders like the MRO. It is certainly the case that a necessary implication can be discerned from the text of an order, such as the implication there that the defendant could not substitute what it viewed as equivalent assets for the ones it had been ordered to disclose. *Id.* at 145. But that is simply not the case here, as

illustrated by the contortions necessary for appellees to bring the City's conduct within the terms of the MRO.

No more persuasive is the Vulcan Society's objection that reversal would somehow render paragraph 16 of the MRO "meaningless" (Vulcan Br. 22). The City has never disputed that the court could order the remedies it instituted on a prospective basis—only whether it could properly find a violation retroactively. Likewise, the City has always consulted, and will continue to consult, with the Monitor and obtain approval where necessary (at a minimum) regardless of the outcome of this appeal. The City is also enacting the additional procedures that the district court laid out in the order on appeal (SPA12). In short, the paragraph's purpose is far more salutary than merely providing a basis for contempt. A ruling that the paragraph did not meet the *King* standard vis-à-vis this particular conduct would hardly render it meaningless.

This Court's jurisprudence is clear. To support a finding that a party has violated an order, the order must do more than "suggest" the conduct is forbidden or require the party to reason "by analogy" to determine what it can and cannot do (U.S. Br. 29–30). It must set forth "precisely what acts are forbidden" with "no uncertainty." *King*, 65 F.3d

at 1058 (cleaned up). The fact that appellees must reason by extension, implication, and analogy to stretch the MRO to cover the City's conduct confirms that the order should be reversed.

## B. Under *King*'s third prong, the City diligently attempted to comply with the MRO.

Reversal is independently warranted on the basis that the City made diligent attempts to comply in a reasonable manner with the MRO. *King*, 65 F.3d at 1058. As the district court found, the City has been "generally compliant" with the MRO over its eight-year history and worked collaboratively with the parties and the Monitor to implement its goals (SPA10). Moreover, the record shows that any lapse occurred in the best of faith (*see id.*).

As our opening brief explained (App. Br. 26–28), while this Court has not squarely addressed the standard for step three of the *King* test in the context of an extensive remedial order like the one at issue here, the test should consider the enjoined party's overall course of conduct with respect to "the order" at issue, *see King*, 65 F.3d at 1058—here, the entire "far-reaching" remedial order. *United States v. City of New York*, 717 F.3d 72, 76 (2d Cir. 2013). And, even if the City's diligent attempt to

comply is considered only within the context of this dispute, it nonetheless made a sufficient showing.

### 1. Appellees offer no principled reason to disregard the City's years of diligent compliance with the MRO.

The United States argues that there is no "controlling precedent" requiring consideration of a party's overall course of conduct with respect to complying with an order (U.S. Br. 38), which the City does not dispute (*see* App. Br. 26). But it fails to engage with the City's arguments that courts *should* evaluate the party's overall course of conduct in applying the third step of the *King* test in the context of complex, multi-year remedial orders. While the United States dismisses *Yurman Studio, Inc. v. Castaneda*, 2009 U.S. Dist. LEXIS 13870 (S.D.N.Y. Feb. 23, 2009), and *Juan F. v. Weicker*, 37 F.3d 874 (2d Cir. 1994), because neither involves the precise circumstances here, they are nonetheless instructive in indicating that a party's "substantial compliance" with "'the objectives of the decree'" is the yardstick by which reasonable diligence should be measured. *Juan F.*, 37 F.3d at 878–89 (quoting *United States v. Commonwealth of Massachusetts*, 890 F.2d 507, 509 (1st Cir. 1989)); *see*

*also Yurman*, 2009 U.S. Dist. LEXIS 13870, at *7. Here, that means compliance should be evaluated in the context of the MRO as a whole.

Indeed, in the context of consent decrees and settlements entered with state and local governments, the Department of Justice recently recognized the costs and difficulties associated with lengthy monitorships covering similarly broad, institutional reforms.[5] To more effectively implement monitorships, DOJ recommendations include caps on fees, term limits for monitors, and a requirement that a termination hearing be held after no more than five years. *Id.* at 4–5, 8. DOJ also recognized that a "consent decree cannot last forever," that progress will "inherently happen incrementally" and that compliance "is not an all-or-nothing goal." *Id.* at 8–9. The federal government's own recognition further reinforces the conclusion that, in the context of a long-running monitorship, compliance should be measured against the party's whole course of conduct.

Likewise, the United States misunderstands the significance of the concurrences in *Missouri v. Jenkins*, 515 U.S. 70 (1995), and *United Mine*

---

[5] U.S. Dep't of Justice, *Review of the Use of Monitors in Civil Settlement Agreements and Consent Decrees involving State and Local Governmental Entities* (Aug. 13, 2021), *available at* https://perma.cc/RW6V-MMN3.

*Workers v. Bagwell*, 512 U.S. 821 (1994). While neither opinion is controlling, as no one disputes, both shed light on the fact that long-running remedial orders are inherently more ambiguous and difficult to perfectly comply with than short-lived and discrete orders are. *Bagwell*, 512 U.S. at 844 (Scalia, J., concurring) (where an order governs "many aspects of a litigant's activities … determining compliance becomes much more difficult"); *Jenkins*, 512 U.S. at 134–44 (Thomas, J., concurring) (extensive post-judgment proceedings may deprive parties of "a clear understanding of their responsibilities"). That judicially recognized fact, in turn, supports the conclusion that the third *King* factor should be evaluated in light of the party's overall compliance with the remedial order at issue.

The United States offers no explanation as to why that sensible standard should not apply, nor any argument in support of a different one (*see* U.S. Br. 38–39). Nor does it dispute that, if evaluation of broader compliance is warranted, then the district court's ruling on *King*'s third prong cannot stand (*see id.*).

For its part, the Vulcan Society argues that, even if the City's conduct is evaluated as a whole, it cannot be said to have substantially

24

complied with the MRO because this breach was "central" to the MRO (Vulcan Br. 26). According to the Vulcan Society, because the decision to call enough candidates to take the CPAT to fill two classes could have had significant consequences for minority candidate attrition, the City's failure to clear that decision with the Monitor outweighs its overall history of compliance and good faith (*id.* at 26–29).

But, as the district court found, the City took numerous conscientious steps to support minority candidates and to mitigate any disparate negative effects from this decision. As the court explained, "attrition rates for Black candidates increased less than for White candidates" as compared to the previous exam, and the City outlined "numerous efforts" it took to "mitigate attrition for Black and Hispanic candidates" leading to "comparatively smaller attrition rates in those cohorts" (SPA11). Indeed, the court found that it was "clear that the City has taken some steps to identify and mitigate adverse effects of the CPAT processes on Black and Hispanic candidates" with "some success" (SPA12). Moreover, the Vulcan Society makes no attempt to square their argument here with their concession that the City, throughout the

history of the Monitorship, "routinely" obtained approval for any number of steps (A746).

Beyond that, the MRO is aimed at multiple, broad substantive areas: development and administration of new written entrance exams, recruitment, an attrition mitigation plan, a holistic reassessment of the entry-level firefighter selection process, post-examination screening, and EEO compliance reform (A247–57); *see also City of New York*, 717 F.3d at 96. Given this breadth, it can hardly be said that the sole breach the district court found here was so central as to dwarf the City's lengthy history of collaborative compliance.

### 2. Even limited to the context of this dispute, the City's attempts to comply were diligent.

Even assuming the "reasonable diligence" test is narrowed to the more specific context of the City's approach to administering the CPAT, the district court's conclusion still cannot stand. The City obtained permission to begin administering the CPAT, and it operated under the (perhaps mistaken) belief that it was continuing its prior practice by calling two classes worth of CPAT candidates at once, for which there was no need to obtain specific approval (A790). Consistent with this

26

belief, the City openly disclosed the number and rate of notifications to the parties and the Monitor from the start (A280, 329–31; E.D.N.Y. ECF No. 1877 at 12). The only thing that went undisclosed was a "change" in practice that the City did not perceive as a change at all (*see* SPA10; A775–77, 908–09).

These facts demonstrate that the City made a diligent attempt to comply with this specific provision of the MRO in this instance too. Thus, even if the decision at issue were a violation of a clear provision of the MRO, the City nonetheless diligently attempted to "accomplish what was ordered." *Powell v. Ward*, 643 F.2d 924, 931 (2d Cir. 1981) (cleaned up).

Here, the district court acknowledged that the noncompliance may have arisen out of "mistaken beliefs" about whether pre-approval was necessary for the decision about the pace of calling candidates for the CPAT (SPA10). If a party reasonably and in good faith believes that it has done what it must to comply with the order, that strongly supports the conclusion it has been reasonably diligent. And, as demonstrated by the at least arguable ambiguity of the MRO (*supra* 10–20), along with the confusion about past hiring practices produced by turnover in the FDNY

27

(A810), the City's belief about what the MRO required was reasonable, even if ultimately mistaken.

In their arguments to the contrary, appellees repeat the district court's error of collapsing steps two and three of the *King* test into one. Both rely on the bare fact of a violation to support the argument that the City must also have failed at step three (U.S. Br. 40; Vulcan Br. 25–26). But for step three to have any independent force, it must permit a party to avoid contempt even if found to have violated the clear terms of the court's order at step two. Neither party offers an explanation of how this Court should apply the third step of the *King* test independently of the finding that the City violated the order at step two.

If the third *King* prong performs any independent analytic work, as it must, the City should be held to have made a reasonably diligent attempt here. In the context of a wide-ranging MRO, the test should consider the party's overall record of compliance, and the City has been nothing but diligent in complying with the MRO. Even if considered in the more limited context of this particular dispute, the City at worst acted out of a good-faith, reasonably mistaken belief about what the MRO required. It made no attempt to conceal its conduct; instead, it provided

28

the data demonstrating the rate at which candidates were called to take the CPAT. Even if the Court were to find the order to be unambiguous, it should still reverse because the *King* test's third prong was not met.

## CONCLUSION

The district court's order should be reversed.

Dated:  New York, NY
            March 10, 2022

Respectfully submitted,

HON. SYLVIA O. HINDS-RADIX
*Corporation Counsel*
*of the City of New York*
Attorney for Appellant

By:   /s/ Jamison Davies
        JAMISON DAVIES
        Assistant Corporation Counsel

100 Church Street
New York, NY 10007
212-356-2490
jdavies@law.nyc.gov

RICHARD DEARING
DEBORAH A. BRENNER
JAMISON DAVIES
    *of Counsel*

29

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared using Microsoft Word, and according to that software, it contains 5,885 words, not including the table of contents, table of authorities, this certificate, and the cover.

/s/ Jamison Davies
JAMISON DAVIES